**GREENBERG TRAURIG OF NEW YORK, P.C., Appellant,**

v.

**Robert MOODY, Jr., Harry J. Briscoe, Robert H. Williams, and Bruce Payette, Appellees.**

No. 14–02–00581–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 30, 2004.

Rehearing Overruled April 21, 2005.

Roger D. Townsend, Phillip T. Bruns, Houston, Jack C. Brock, Galveston, for appellant.

Fred A. Simpson, Richard Earl Griffin, Valorie W. Davenport, Houston, Joseph A.C. Fulcher, League City, for appellees.

Panel consists of Justices YATES, FOWLER, and FROST.

## OPINION

KEM THOMPSON FROST,

This is a double appeal of a complex securities fraud and conspiracy case in which a jury rendered a multi-million-dollar verdict in favor of three Texas investors and against a New York law firm. A fourth investor recovered nothing. The trial court reduced the amounts of the jury awards for the successful plaintiffs and entered final judgment against the law firm. All parties appeal. At issue are statutory claims alleging violations of state securities laws, conspiracy, common-law fraud, and statutory fraud. The resolution of many of these issues turns on the conflicts-of-law analysis. We find the trial court should have applied New York law instead of Texas law to the fraud-based claims. After reviewing the issues raised under applicable law, we reverse and ren-

der, in part, and reverse and remand, in part.

## I. OVERVIEW OF PARTIES AND CLAIMS

### A. Parties

Appellees and cross-appellants, Robert Moody, Jr., Harry J. Briscoe, Robert H. Williams, and Bruce Payette, the plaintiffs in the trial court (collectively, the "Investors"), are Texans who invested in a food technology venture known as Integrated Food Technologies Corporation ("IFT"). The Investors based their claims in this case on their investments in this failed enterprise.

Appellant, Greenberg Traurig of New York, P.C. ("Greenberg Traurig"), one of several defendants in the trial court, is a national law firm, based in New York. IFT retained Greenberg Traurig to perform various legal services on its behalf. The Greenberg Traurig attorneys who were principally involved in this legal representation, Robert Kirshenberg and Stephen Weiss, were originally named as defendants. These individual attorneys successfully challenged the trial court's jurisdiction over them and the claims against them were dismissed due to lack of personal jurisdiction.

### B. Facts

IFT is a Delaware corporation formed to "design, develop, and market biotech indoor aquaculture production and processing facilities," which essentially entailed raising fish in technologically-advanced tank facilities. IFT had two facilities in operation, one located in Pennsylvania and one in Maine. The Pennsylvania facility served as IFT's headquarters.

IFT's founder, Jack Summers ("J.Summers"), professed to be an international marketing strategist with a history of marketing food technology systems and products. J. Summers was IFT's Chairman and Chief Executive Officer ("CEO"). His son, Robert Summers ("R.Summers") was Director of Operations for IFT.

### Greenberg Traurig's Representation of IFT

In 1995, Robert Kirshenberg was a litigation associate in Greenberg Traurig's New York office. Kirshenberg, who owned a very small amount of stock in IFT, approached J. Summers about the possibility of Greenberg Traurig representing IFT. Although no attorney-client relationship resulted at that time, the following year IFT retained Greenberg Traurig as its corporate counsel. In November 1996, Greenberg Traurig agreed to represent IFT "in connection with both the Company's general corporate affairs and a proposed initial public offering, together with other attendant corporate and [Securities and Exchange Commission] matters."

A public offering requires securities to be registered with a governmental agency. Both registered and unregistered securities have disclosure requirements to potential investors; however, registered securities also require audited financial statements. The accounting firm of Arthur Andersen began serving as IFT's independent auditor in mid–1996, but very shortly thereafter decided to discontinue the relationship. One of Greenberg Traurig's first duties once retained to represent IFT in the fall of 1996 was to try to convince Arthur Andersen to reconsider its decision to withdraw as independent auditor for IFT. Arthur Andersen had agreed in June 1996, to audit IFT's financial statements as of March 31, 1996. However, in October 1996, Arthur Andersen resigned as IFT's independent auditor, stating that J. Summers had failed to disclose a recent judgment against him in

Mississippi for conversion of corporate funds. Despite Greenberg Traurig's efforts to convince the accounting firm to stay on board as IFT's independent auditor, Arthur Andersen would not reconsider its decision to terminate its relationship with the company.

IFT also asked the recently-retained Greenberg Traurig to assist the company's management in preparing for an annual shareholders meeting to be held on November 23, 1996. Greenberg Traurig helped edit the script of the presentation IFT's management would make at the shareholders meeting. With regard to the Arthur Andersen matter, Greenberg Traurig suggested that the IFT board tell the shareholders, "We have encountered some difficulty with the Andersen group and are exploring a number of ways to proceed with them or another big 6 firm." No mention was made of the Mississippi judgment or the reason Arthur Andersen terminated its relationship with IFT.

By the end of 1996, IFT had hired a new independent auditor—the accounting firm of Parente, Randolph, Orlando, Carey & Associates ("Parente Randolph")—to complete the audit originally begun by Arthur Andersen. In January 1997, IFT also hired the law firm of Gross, McGinley, LeBarre & Eaton ("Gross McGinley"), apparently replacing Greenberg Traurig, as the company's corporate counsel. Greenberg Traurig, however, continued to represent IFT in a trademark litigation matter.

### Compliance with Securities Laws and Rescission Offer to IFT Investors

About that time, issues arose as to whether IFT's stock had been issued in compliance with securities laws. A company like IFT could begin with the private placement of unregistered shares of stock to an unlimited number of accredited investors and a limited number of unaccredited investors, and later undertake an initial public offering to register the shares and sell them publicly. In a letter to Parente Randolph, dated February 24, 1997, Gross McGinley, IFT's new corporate counsel, opined that IFT stock "may have been issued without compliance with or exemption from securities registration or disclosure acts." IFT asked Gross McGinley to take action to bring the company into compliance with securities laws.

In the spring of 1997, IFT's financial statements for the fiscal year ending March 31, 1996, were issued disclosing IFT's past noncompliance with securities law, and stating the "ultimate outcome in this matter cannot be determined at this time." Due to these securities compliance issues, it appeared that IFT might need to present a rescission offer to existing shareholders in order to bring IFT into compliance with the securities laws. This remedial action stemmed from J. Summers' sales of IFT shares in violation of a permanent injunction the Securities and Exchange Commission ("SEC") had issued against him in 1981,[1] enjoining him from selling unregistered securities.[2] These developments prompted IFT to again seek legal advice, this time from Ellsworth, Wiles & Chaplain ("Ellsworth Wiles"), a Philadelphia law firm retained in May 1997, to serve as IFT's "securities attor-

---

1. *See Securities & Exchange Comm'n v. Manus,* No. C–81–1222–RPA, 1981 WL 1721 (S.D.N.Y. Dec. 6, 1981) (setting forth district court's order permanently enjoining J. Summers from selling unregistered securities).

2. IFT could sell registered securities only if it filed a registration statement. *See* 15 U.S.C. § 77e(a) (2004). However, because securities issued in a private placement are not registered securities, J. Summers could not, due to the permanent injunction, sell stock issued in a private placement.

neys in connection with a rescission offer to some or all of IFT's stockholders."

These developments were significant because any sales in violation of the SEC permanent injunction against J. Summers would not only raise serious compliance issues, but also would jeopardize IFT's plans for an initial public offering. Within a few months, Ellsworth Wiles concluded that IFT would have to make a rescission offer to current shareholders. In a July 7, 1997 memorandum, attorney Gerald Chalphin of Ellsworth Wiles suggested that IFT should set aside more than $16 million to cover the cost of the rescission offer. Greenberg Traurig denied any knowledge of Ellsworth Wiles' estimate for the rescission offer.

### The Texas Investors

In mid-October 1997, the investment banking firm of Donaldson, Lufkin & Jenrette ("DLJ") was engaged to underwrite an initial public offering for IFT. In late October 1997, appellee Robert Moody, Jr., an accredited investor, toured IFT's facility in Pennsylvania as a prospective investor in the company. J. Summers urged Moody to purchase IFT stock, telling him that DLJ was about to underwrite an initial public offering. In mid-October 1997, J. Summers sent Moody copies of draft IFT financial statements for 1997, stating, "We do not expect any major changes." A few days later, IFT's new auditors, Cogen Sklar, L.L.P., sent a draft auditor's report to R. Summers. Note 16 of the report indicated that IFT stock "may have been issued without compliance with or exemption from certain securities registration or disclosure acts." Cogen Sklar further explained it was "unable to express, and we do not express, an opinion on the financial statements." Within a few more days, J. Summers sent Moody selected pages from Cogen Sklar's draft auditor's report. The bottom of each page sent to Moody stated: "The accompanying notes are an integral part of these financial statements." However, J. Summers excluded the page containing the notes from the pages he gave Moody. Thus, Moody did not receive the pages from the report stating that the stock had not been issued in compliance with securities regulations. On October 29, 1997, after touring IFT's Pennsylvania facility and meeting with J. Summers, Moody purchased $600,000 in IFT shares.[3] Greenberg Traurig was not involved in, and claimed to know nothing about, Moody's dealings with J. Summers.

In December 1997, appellee Harry Briscoe, an accredited investor, purchased $30,000 worth of unregistered IFT shares. Although DLJ had terminated its agreement with IFT, J. Summers represented to Briscoe that the securities firm was going to underwrite IFT's initial public offering, which J. Summers represented was imminent. J. Summers sent Briscoe a copy of the draft prospectus. Greenberg Traurig was not involved in, and claimed to know nothing about, Briscoe's dealings with J. Summers, his investment in IFT, or the prospectus on which he claimed to have relied.

In February 1998, appellee Robert Williams, an accredited investor, purchased his IFT shares for $27,500. Williams first heard of IFT when Briscoe spoke to him about it in the fall of 1997. Briscoe provided Williams with a videotape and a copy of the draft prospectus. Briscoe told Williams that J. Summers had represented to him that an initial public offering was imminent. Williams relied on the same prospectus Briscoe had reviewed.

### Preparation for an Initial Public Offering

During 1997, Ellsworth Wiles continued

---

3. In July 1998, Moody purchased additional IFT shares for $66,000.

to serve as IFT's "securities attorneys."[4] In early November 1997, Kirshenberg wrote R. Summers a letter, in which he reviewed the scope of Greenberg Traurig's work for IFT, and stated, among other things, that Greenberg Traurig "remain[ed] eager to assist you in finding an appropriate underwriter or other source of capital." In December 1997, IFT asked Greenberg Traurig to introduce IFT to investment bankers in furtherance of its goal of an initial public offering.

With the IFT stock rescission offer still an issue, on December 9, 1997, Gerald Chalphin of Ellsworth Wiles then opined that the rescission offer would cost IFT $110,000. No mention was made of the previously suggested $16 million figure necessary to cover the liability for the rescission offer as set forth in Chalphin's July 7, 1997 memorandum.

In January 1998, IFT issued its annual report for the fiscal year ending March 31, 1997. As in the report for the fiscal year ending in March 1996, Cogen Sklar, IFT's independent auditor, explained that IFT's stock might not have been issued in compliance with certain securities regulations. However, the report further explained, "The Company estimates that the potential cost associated with this matter will be less than $110,000, but does not believe that this outcome is probable." Though Cogen Sklar explained in the annual report that the problem could be resolved for $110,000, it did not mention the previous $16 million estimate.

Meanwhile, Greenberg Traurig was seeking to expand the scope of its representation of IFT and had introduced the accounting firm, Ernst & Young, to IFT as a potential independent auditor. During the course of conducting its due diligence on IFT, Ernst & Young learned of the 1981 SEC injunction against J. Summers. In February 1998, Ernst & Young informed Kirshenberg and Greenberg Traurig of the injunction. Given J. Summers' problems with the SEC, Greenberg Traurig told J. Summers that in order for an initial public offering to proceed, J. Summers should step down as CEO of IFT and place his shares in a non-voting trust.

### J. Summers' Resignation as CEO of IFT and Appointment to Executive Committee

In April 1998, a letter was sent to shareholders informing them that J. Summers was stepping down as IFT's CEO, but that he would remain with IFT to continue efforts to market its technology system, and that "[a] new CEO and management organization [would] take over the day-to-day operations of the company." However, the April 27, 1998 IFT board meeting minutes reflect that the board authorized the creation of the "Executive Committee to run the daily operations of the company." The Executive Committee was to be chaired by J. Summers. Although J. Summers was supposed to have put his IFT shares in a non-voting trust, that never happened. Greenberg Traurig denied any knowledge of J. Summers' secret role in running IFT.

### Maine Litigation

In May 1998, IFT, J. Summers, and R. Summers were sued in the United States District Court in Maine for, among other claims, selling unregistered securities in violation of Maine securities laws. Kirshenberg settled the lawsuit on behalf of IFT. Kirshenberg testified that he became aware of J. Summers' selling of IFT stock

---

**4.** A prospectus J. Summers used as a marketing tool mentioned Ellsworth Wiles, and IFT's 1997 annual report again listed Ellsworth, Wiles as IFT's "securities attorneys."

during the Maine lawsuit in late spring or early summer 1998.

### Loans from Bank of Pennsylvania

In the meantime, Greenberg Traurig had continued its efforts to secure financing for IFT. In August 1998, with the assistance of Greenberg Traurig, IFT obtained a secured loan in the amount of $750,000 and a secured line of credit in the amount of $500,000 from the Bank of Pennsylvania. IFT defaulted on the loan just two months later in October 1998, and the bank foreclosed on the collateral.

### IFT's Bankruptcy

Greenberg Traurig was pursuing the possibility of an initial public offering for IFT until October 1998, when Tyler Carlucci, who was then CEO of IFT, informed Dan Moran, another IFT officer, that he had discovered a list of more than 1,000 IFT shareholders—more shareholders than are legally permitted for a nonpublic company. Carlucci concluded that IFT was not in compliance with federal securities laws. Carlucci and Moran also discovered J. Summers had not paid value for his IFT shares. They met with IFT's directors to address these serious matters, but ultimately IFT could not be salvaged. Carlucci and Moran eventually sought Chapter 11 bankruptcy protection for IFT in November 1998. No initial public offering was ever made.

### C. The Investors' Claims

The Investors brought suit in a state district court in Galveston, Texas, against J. Summers, R. Summers, Pegasus Enterprises, Cogen Sklar, IFT, two of IFT's directors (Phil Templeman and Elaine Templeman), Greenberg Traurig, and two of the law firm's attorneys (Kirshenberg and Weiss). The claims against R. Summers, Cogen Sklar, Weiss, and Kirshenberg were dismissed after the granting of their special appearances. J. Summers, the Templemans, IFT, and Pegasus Enterprises failed to appear at trial.

The Investors sought to recover against Greenberg Traurig for alleged violations of the Texas Securities Act and also asserted claims based on statutory fraud, common-law fraud, and civil conspiracy. The Investors claim that Greenberg Traurig assisted J. Summers in defrauding them by failing to disclose the law firm's alleged knowledge of the following:

- In 1981, the SEC enjoined J. Summers from selling unregistered securities.
- A judgment had been taken against J. Summers in Mississippi for conversion of corporate funds.
- IFT and J. Summers had been sued in federal court in Oklahoma "related to the acquisition" of IFT stock and had paid to settle that lawsuit.
- IFT and J. Summers had been sued in federal court in Maine for selling unregistered securities in violation of Maine law.
- J. Summers had been granted a discharge in bankruptcy.
- Predecessor companies also founded by J. Summers—AquaTech International, Ltd. and Nutritech Systems, Ltd.—had both failed.
- No initial public offering could ever be made because J. Summers had been selling unregistered securities in violation of the SEC injunction.
- IFT had too many shareholders for a nonpublic corporation.

### II. JURY FINDINGS AND TRIAL COURT JUDGMENT

The jury found Greenberg Traurig liable for (1) violations of the Texas Securities Act—directly as a seller, and indirectly as

a control person and in materially aiding a seller, (2) common-law fraud, (3) statutory fraud (including by clear and convincing evidence of Greenberg Traurig's actual awareness of the fraud), and (4) civil conspiracy (including by clear and convincing evidence that Greenberg Traurig acted with malice). Breaking the statutory cap on exemplary damages,[5] the jury further found Greenberg Traurig had secured the execution of a document by deception[6] and had committed commercial bribery.[7]

The trial court's final judgment awarded Moody actual damages of $690,090 and prejudgment interest of $193,225.20 against Greenberg Traurig and all other defendants, jointly and severally. Moody was also awarded exemplary damages of $20,702,700 against Greenberg Traurig.[8]

Briscoe was awarded actual damages of $30,000 and prejudgment interest of $8,400 against Greenberg Traurig and all other defendants, jointly and severally. Briscoe was also awarded exemplary damages of $900,000 against Greenberg Traurig.[9]

Williams was awarded actual damages of $27,500 and prejudgment interest of $7,700 against Greenberg Traurig and all other defendants, jointly and severally, and exemplary damages of $825,000 against Greenberg Traurig.[10]

The final judgment further ordered that Moody, Briscoe, and Williams recover from Greenberg Traurig attorney's fees of $1,611,500 for preparation and trial, plus $325,260 for expenses, $190,000 for appeal to the court of appeals, and $85,000 for appeal to the Texas Supreme Court.

Although the jury awarded Moody $20,702,700, Briscoe $900,000, and Williams $825,000 in actual damages for common-law fraud, the trial court did not award those amounts, but instead reduced those amounts in its final judgment. The jury failed to find in favor of Bruce Payette on any of his claims against Green-

---

5. TEX. CIV. PRAC. & REM.CODE ANN. § 41.008(c) (Vernon Supp.2004).

6. TEX. PEN.CODE ANN. § 32.46(a)(1) (Vernon Supp.2004).

7. TEX. PEN.CODE ANN. § 32.43 (Vernon 2003).

8. Moody was also awarded actual damages of $20,012,610 and prejudgment interest in the amount of $5,603,530.80 and attorney's fees of $1,611,500 for preparation and trial, plus $325,260 for expenses, $190,000 for appeal to the court of appeals and $85,000 for appeal to the Texas Supreme Court, jointly and severally, against IFT, J. Summers, and Philip and Elaine Templeman. Moody was further awarded exemplary damages of $4,830,630 against J. Summers, of $10,351,350 against IFT, of $690,090 against Philip Templeman, and of $690,090 against Elaine Templeman.

9. Briscoe was also awarded actual damages in the amount of $870,000, prejudgment interest in the amount of $243,600, and attorney's fees in the amount of $1,611,500 for preparation and trial, plus $325,260 for expenses, $190,000 for appeal to the court of appeals and $85,000 for appeal to the Texas Supreme Court, jointly and severally, against J. Summers, IFT, and Philip and Elaine Templeman. Briscoe was further awarded exemplary damages against J. Summers in the amount of $210,000, IFT in the amount of $450,000, Philip Templeman in the amount of $30,000, and Elaine Templeman in the amount of $30,000.

10. Williams was also awarded actual damages in the amount of $822,500, prejudgment interest in the amount of $230,300, attorney's fees for preparation and trial in the amount of $1,611,500, plus $325,260 for expenses, $190,000 for appeal to the court of appeals and $85,000 for appeal to the Texas Supreme Court, jointly and severally, against J. Summers, IFT, and Philip and Elaine Templeman. Williams was further awarded exemplary damages against J. Summers in the amount of $192,500, IFT in the amount of $412,500, Philip Templeman in the amount of $27,500, and Elaine Templeman in the amount of $27,500.

berg Traurig.[11] We will address issues relating to those awards in our consideration of Bruce Payette's cross-appeal.

## III. CONFLICTS OF LAWS

Whether to apply Texas, Pennsylvania, or New York law to the Investors' claims is a pivotal issue in this case. The trial court applied Texas law to all claims. Greenberg Traurig claims that the trial court erred in applying Texas law because New York law should govern the fraud-based claims. The Investors argue there was no error but that we need not even reach this issue because Greenberg Traurig waived any complaint about the application of Texas law by failing to properly preserve error for appellate review.

### A. Preservation of Error

■ The Investors assert Greenberg Traurig has waived its contention that New York law should apply to this case. After reviewing the record, we disagree and find that Greenberg Traurig adequately preserved this issue for appeal. In the trial court, Greenberg Traurig asserted the application of New York law in many ways:

- by arguing New York law applied in its motion for summary judgment, which the trial court denied, specifically stating that "Texas law applies in all aspects of this matter";
- by making conflicts-of-laws arguments in its trial brief regarding applicable attorney disciplinary rules;
- by making oral arguments to the trial court during trial that New York dis-

ciplinary rules applied to New York attorneys;

- through charge conference objections to the application of Texas law, which the trial court overruled;
- by requesting the trial court to take judicial notice of all conflicts-of-laws issues presented, which the trial court did;
- by arguing for the application of New York law at the hearing on the motion to enter judgment (directly after receiving the jury's verdict), which arguments the trial court again rejected; and
- by setting forth the conflicts-of-laws arguments in its consolidated post-trial motion, which the trial court denied.

To preserve an issue for appellate review, a party must make its complaint known to the trial court by a timely request or objection that is specific enough for the trial court to be aware of the complaint and then receive a ruling from the trial court. TEX.R.APP. P. 33.1. We find Greenberg Traurig's conflicts-of-laws arguments were properly preserved for appellate review. Accordingly, we now turn to the merits of these arguments.

### B. Applicable Law

■ A court must make a conflicts-of-laws decision only when the case is connected with more than one state and the laws of the states in question differ on one or more points in issue. *See Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 650

---

11. Bruce Payette was awarded actual damages in the amount of $435,000, prejudgment in the amount of $121,800, and attorney's fees in the amount of $1,611,500 for preparation and trial, plus $325,260 for expenses, $190,000 for appeal to the court of appeals and $85,000 for appeal to the Texas Supreme Court, jointly and severally, against J. Summers, IFT, and Philip and Elaine Templeman. Payette was also awarded exemplary damages against J. Summers in the amount of $101,500, IFT in the amount of $217,500, Philip Templeman in the amount of $14,500, and Elaine Templeman in the amount of $14,500.

(Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.), *leave granted, mand. denied,* 951 S.W.2d 394 (Tex.1997) (holding burden is on party asserting application of foreign law to first show existence of true conflict of laws and then demonstrate which law should apply; in absence of such showing, it is presumed other states' laws are same as Texas law). Because this is such a case, our task is to determine which state's law—Texas, Pennsylvania, or New York—should govern the Investors' claims.

### Standard of Review

◼ The issue of which state's law governs is a question of law for the court to decide. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 848 (Tex.2000). Therefore, we review de novo the trial court's decision to apply Texas law. *See Minnesota Mining & Mfg. Co. v. Nishika Ltd.,* 955 S.W.2d 853, 856 (Tex.1996).

### General Discussion

◼ In Texas, when there is a conflict of laws, the method for determining the applicable law is the "most significant relationship" test contained in the Restatement (Second) of Conflicts of Laws. *Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex.2000). Generally speaking, in determining conflict-of-laws issues, Texas courts focus their examination on which state has the most meaningful connections with and interests in the parties and the transactions. The various contacts are to be evaluated according to their relative importance with respect to the particular issue at hand. *Id.* This Restatement methodology requires a separate conflict-of-laws analysis for each issue in a case.

. The claims in this case may be grouped into two categories: (1) fraud-based claims and (2) conspiracy claims. Although Greenberg Traurig challenges the application of Texas law to the fraud-based claims, it asserts no differences in the substantive law of New York and Texas applicable to the Investors' conspiracy claims. Accordingly, with respect to the conspiracy claims, we need not conduct a conflict-of-laws analysis; instead, we may presume New York law is the same as Texas law. *See Weatherly,* 905 S.W.2d at 650. Thus, we apply Texas law to the conspiracy claims and conduct a conflict-of-laws analysis for the fraud-based claims.

### Fraud–Based Claims

The starting point for any conflict-of-laws decision is the Restatement (Second) of Conflicts of Laws Section 6. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 6 (1971). The factors relevant to our application of the "most significant relationship" test are drawn from Section 6(2), which provides a list of the following general factors:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) the certainty, predictability, and uniformity of result; and

(g) the ease in the determination and application of the law to be applied.

*Id.* More particularized factors are found in other relevant sections of the Restatement. The contacts to be considered in applying the Section 6 principles to an issue in tort are found in Section 145. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145. This section states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account . . . to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.*

A third provision of the Restatement, Section 148, applies to actions to recover pecuniary damages for fraud or misrepresentation. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148. Although the Texas Supreme Court has not yet applied this section, this court and other intermediate appellate courts have done so in determining the governing law in fraud and misrepresentation cases. *See Tracker Marine, L.P. v. Ogle,* 108 S.W.3d 349 (Tex. App.-Houston [14th Dist.] 2003, no pet.); *Scottsdale Ins. Co. v. National Emergency Servs., Inc.,* —— S.W.3d ——, ——, No. 01–02–00929–CV, 2004 WL 1688540, at *7 (Tex.App.-Houston [1st Dist.] 2004, no pet. h.). The Restatement factors set forth in Section 145 for general torts are very similar to those listed in Section 148 for fraud

and misrepresentation. *Scottsdale Ins. Co.,* at ——, 2004 WL 1688540, at *7. The factors under Section 148 include:

(a) the place where the plaintiff acted in reliance upon the defendant's representations;

(b) the place where the plaintiff received the representations;

(c) the place where the defendant made the representations;

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties;

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time; and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 148(2).

The comments to Section 148(2) of the Restatement describe contacts (a), (b), (c), and (d) as the "more important of these contacts." *Id.* at cmt. e. "If any two of the above-mentioned contacts, apart from the defendant's domicile, state of incorporation, or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." *Id.* at cmt. j; *see also Tracker Marine, L.P.,* 108 S.W.3d at 356. The contacts in this case fall in three states—Texas, Pennsylvania, and New York.

Contacts (a) and (b) point to Pennsylvania and Texas.[12] Contact (c) points only to

---

**12.** The Investors claim that many misrepresentations occurred during Moody's tour of IFT's Pennsylvania facility conducted by J. Summers. Moody's action in reliance on

these representations occurred for the most part in Pennsylvania. He made his decision to invest while in Pennsylvania, though he did not send his check to purchase the IFT stock

New York. Contact (d) points to both Texas and New York. Contact (e) points to Pennsylvania.[13] Contact (f) has mixed results.[14] However, most of the conduct upon which the Investors' claims are based occurred in New York. This is significant because when evaluating fraud-based claims to determine governing law, the principal focus is where the conduct occurred. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 145, 148.

■ In the trial court the Investors asserted a variety of allegations against a number of different parties. Some of the allegations were aimed at IFT and its principals, with whom the Investors had personal contact and direct dealings, while other allegations were aimed at defendants like Greenberg Traurig, with whom the Investors had no contact and no direct dealings. This important distinction greatly impacts the conflict-of-laws analysis.

The Investors allege that Greenberg Traurig made affirmative misrepresentations concerning IFT's financial condition,[15] J. Summers' "legal woes," [16] the "bona fides of IFT's management," [17] and IFT's "ability to go public." [18] The gist of these allegations is that Greenberg Trau-

---

until he returned to Texas. Under these circumstances, the Restatement suggests that the law of Pennsylvania would apply "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties," in which event the local law of the other state should be applied. *See* RESTATEMENT (SECOND) CONFLICTS OF LAW § 148. Some acts in reliance occurred in Pennsylvania (Moody's decision to invest during his visit to IFT's Pennsylvania facility), while others occurred in Texas (sending checks and wiring money from Texas to purchase IFT stock). Thus, no state emerges as the sole place of reliance.

13. The Investors' failed investment in IFT is the subject of this suit. IFT's headquarters and main facility are located in Pennsylvania.

14. Moody's stock purchase agreement provides for notice to Moody in Galveston, Texas, but specifies no place of performance, and contains no provision stating that Moody's performance is to be rendered in Texas. There is no evidence indicating where Moody sent his money to purchase his shares, but Briscoe received instructions to wire funds to IFT's bank in Pennsylvania.

15. To support their claims that Greenberg Traurig was participating in the fraud, the Investors rely on statements in an August 12, 1998 opinion letter Greenberg Traurig issued in connection with IFT's efforts to obtain a secured term loan and a secured line of credit from the Bank of Pennsylvania. These ac-

tions by Greenberg Traurig all occurred in New York.

16. The Investors allege that Greenberg Traurig failed to disclose material information relating to the cost of an IFT rescission offer to its shareholders. Communications relating to these events took place in New York.

17. The Investors allege that in the fall of 1996, J. Summers retained Greenberg Traurig to assist IFT in preparing for its annual shareholders meeting scheduled to take place in New York. Among the topics covered at that meeting was Arthur Andersen's resignation as IFT's independent auditor. The Investors allege that by failing to disclose the true reason for the auditor's resignation—the Mississippi judgment against J. Summers—and to make other necessary disclosures at this meeting, Greenberg Traurig assisted IFT and J. Summers in defrauding investors. These events— preparation and presentation for the annual shareholders meeting—occurred in New York.

18. The Investors allege that in December 1997, IFT urged Greenberg Traurig to introduce IFT to investment bankers so that IFT could pursue its goal of an initial public offering and that despite knowledge of J. Summers' activities, Greenberg Traurig did so, thereby furthering a conspiracy to defraud. Greenberg Traurig introduced IFT to Josephthal & Co., a New York securities corporation. Greenberg Traurig's activities concerning Josephthal took place in New York.

rig made it possible for IFT to continue the illusion that an initial public offering would occur and that Greenberg Traurig "made unlawful selling possible" by preparing documents and otherwise helping to construct an illusory initial public offering that J. Summers used as a "major selling tool." To the extent Greenberg Traurig made misrepresentations concerning these matters, it made them from its offices in New York. These representations were not directed to Texas. Except for one visit to Pennsylvania, whatever Greenberg Traurig did, it did in New York.

Though some events significant to the Investors' claims as they relate to the other defendants occurred outside New York, these events did not occur in Texas but in Pennsylvania. The Investors allege that in late October 1997, Moody toured IFT's facility in Pennsylvania, where J. Summers urged him to invest in IFT by telling him that DLJ was about to underwrite an initial public offering. J. Summers made similar representations to Briscoe, who purchased IFT shares and then passed the IFT draft prospectus along to Williams, who also invested. Funds (checks and wire transfers) for these purchases of IFT shares were sent to Pennsylvania, although they originated in Texas. The only other conduct relating to Texas is that IFT and its principals traveled to Nacogdoches, Texas, for an IFT presentation, but that trip was made long before IFT retained Greenberg Traurig. Because the Investors' claims against Greenberg Traurig must be evaluated separately and without dependence on claims against the other defendants, these Texas contacts have little, if any, impact on the conflict-of-laws decision. Even if they did, it is clear that these contacts with Texas were neither more numerous nor more qualitatively significant than either the New York or the Pennsylvania contacts.

Pennsylvania's contacts include the location of IFT's headquarters and main operating facility where Moody decided to invest. With respect to the claims against Greenberg Traurig, however, New York has the dominant contacts with the parties and the particular events in issue. New York is the home state of Greenberg Traurig. Most of the conduct in question occurred in New York and substantially all of Greenberg Traurig's activities *vis a vis* IFT occurred in New York. None occurred in Texas.

The Texas contacts are relatively few, the principal one being that it is the home state of the Investors. Significantly, all of the events relating to the Investors' claims against Greenberg Traurig occurred outside of Texas. To the extent that harm occurred in Texas and the injured parties resided in Texas, Texas may have an interest in assuring that these individuals secure redress for any damages suffered. The relative strength of this interest, however, depends on the balance of policies struck by the relevant tort laws. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 145 cmt. c.

Generally, the state where the act or omission occurs has a real interest in applying its law in order to implement the state's regulatory policy as reflected in that law. Securities fraud is an area of the law regulated by statute. Because New York's securities statutes reflect its regulatory policies, New York has a strong and substantial interest in the application of its laws in furtherance of those policies. *Id.* at § 6(c). Greenberg Traurig's connections to New York are significant and strongly support New York's substantial interest in seeing its law apply to the Investors' fraud claims. By choosing to apply Texas law instead of New York law, the trial court did not recognize New York's substantial interest in regulating

fraudulent conduct occurring in New York. *Cf. id.* at § 145 cmt. c ("If the primary purpose of the tort rule involved is to deter or punish misconduct, . . . the state where the conduct took place may be the state of dominant interest . . .").

The Restatement counsels that in tort cases, the expectations of the parties are less significant than in contract cases. *See id.* at § 145 cmt. b. However, to the extent this consideration factors into the analysis, it points to New York law. The individuals investing in IFT had a reasonable expectation that New York law would govern any transaction because the draft prospectus on which the Investors rely to support their fraud allegations states that New York law would govern. Although the Investors point to Moody's Stock Purchase Agreement, which contains a Texas choice-of-law provision, their reliance on this contract is misplaced because it governs only this agreement, to which Greenberg Traurig was not a party. Therefore, this choice-of-law provision cannot be enforced against Greenberg Traurig. *See* RESTATEMENT (SECOND) CONFLICTS OF LAW § 187 (setting forth factors when parties have chosen law of state "to govern their contractual rights and duties"); *In re J.D. Edwards World Solutions Co.*, 87 S.W.3d 546, 549 (Tex.2002) (involving "the *contracting parties'* choice of law") (emphasis added).

It is apparent from the Investors' pleadings that their claims against Greenberg Traurig arose from conduct centered in, or directed to, New York. The professional services the law firm provided were performed in New York. The law firm's participation in meetings and activities with other actors implicated in the fraud and conspiracy allegations (e.g., J. Summers and IFT) also occurred in New York. The written communications from Greenberg Traurig alleged to be part of the fraud and conspiracy emanated from the law firm's offices in New York. No conduct of Greenberg Traurig occurred in, or was directed to, Texas. Consequently, the New York lawyers involved in these transactions would have had no reasonable expectation that Texas law would govern their conduct. Because the Investors were aware that they were dealing with non-Texans and because Greenberg Traurig had no equivalent awareness of the Texas Investors, considerations of fairness and protection of the reasonable expectations of the parties point to the application of New York law.

Although the Investors are Texans, there is little other connection with Texas. Most of the original defendants are residents of New York or Pennsylvania. The meetings and communications between the Investors and one or more alleged conspirators took place outside of Texas. The accounting firms that served or were requested to serve as independent auditors of IFT (Arthur Anderson, Parente–Randolf, Cogen Sklar, and Ernst & Young), as well as the investment banking group, and the securities corporations (DLJ, Bear Stearns & Co., Inc., and Josephthal & Co., Inc.), were based in New York or Pennsylvania. IFT's facilities were located in Pennsylvania and Maine. Given that the conduct alleged to have caused the Investors' injuries occurred mostly in New York and, to a lesser extent, in Pennsylvania, the Texas interests are attenuated and far less significant given the relevant considerations. It is New York, as the locus of most of the alleged fraudulent acts and as Greenberg Traurig's principal place of business, that has the greatest interest in fashioning the penalty imposed by the tort system.

Greenberg Traurig performed no attorney services for IFT in Texas. Its attorneys were not licensed to practice law in Texas. More importantly, the locus of

their allegedly tortious conduct was not in Texas.

The Investors' fraud claims against Greenberg Traurig are based largely on the law firm's alleged duty to disclose IFT's fraudulent conduct—a duty the Investors claim arose from Greenberg Traurig's attorney-client relationship with IFT. These claims hinge almost entirely on the notion that by failing to disclose alleged fraud by its client, IFT, Greenberg Traurig violated a fiduciary duty it owed as attorneys for IFT. The breach of fiduciary duty, if any, arose from acts or omissions in New York, where Greenberg Traurig's offices were located and its attorneys practiced law. It is New York, not Texas, that has the keen interest in disciplining attorneys practicing law in New York. New York's strong interest in regulating the conduct of its lawyers, and the undeniable connection between that interest and the issues in this case, outweigh any interest Texas might have *vis a vis* the Investors' fraud-based claims. This strongly suggests that New York has a more significant relationship to this particular issue.

Generally speaking, tort law policies influence standards and procedures used to determine liability, fix compensation, and deter tortious conduct. The differing degrees of interest that the states have in addressing tort law policies necessarily impact the conflict-of-laws analysis. The trial court did not recognize New York's strong interest in seeing that New York attorneys are properly regulated in accordance with New York law, opting instead to look to Texas law on professional misconduct. Texas has no policy or interest in regulating the communications occurring in New York between New York lawyers and their non-Texas clients, nor any interest in defining the ethical requirements for attorney-client disclosures in New York. Likewise, Texas has no interest

in applying its law in order to implement the policy reflected in New York's disciplinary rules or other law governing the conduct of New York lawyers practicing in New York.

█ Fairness is a significant consideration in the conflict-of-laws analysis. A court should not apply its own law, even when the forum state has an interest in it doing so if the application of the forum state's law would be unfair to the party against whom it is to be applied. Clearly, it would be unfair to apply the rules of professional conduct governing Texas lawyers to New York lawyers who are neither licensed in Texas nor practicing in the state. The selection of New York law for the Investors' fraud claims based on an alleged fiduciary duty arising out of an attorney-client relationship furthers the relevant factors stated in Section 6 of the Restatement. Applying these factors, it is manifest that the law of New York, not Texas, should govern the Investors' fraud claims that are based on a fiduciary duty owed by New York lawyers to their clients.

Under the "most significant relationship" test, Texas lacks the contacts with, or interests in, the litigation that could support a finding that it has the most significant relationship. While it is arguable that Texas has some relationship to the transactions at issue, it does not have the dominant or most significant relationship necessary to displace the law of New York. Though Texas has some interest in seeing that harms occurring within its borders are redressed, the actions and omissions of Greenberg Traurig did not occur in Texas. In any event, this interest must yield when another state, such as New York, has a more significant relationship to the matters in dispute.

The factors delineated in Section 6, to which Section 148(1) refers, on balance

point to the application of New York law. Considering all of the factors, Texas' interest is far less compelling than that of New York. The contacts with New York are greater in number and are more qualitatively significant than those of Pennsylvania or Texas. Both the volume and weight of contacts point toward New York law. Having fully considered the interests of Texas, Pennsylvania, and New York in light of the relevant factors, we conclude that New York has the most significant relationship to the transactions and to the parties. New York law should therefore govern the Investors' fraud-based claims. Accordingly, we hold that the trial court erred in applying Texas substantive law to the Investors' fraud-based claims.

## IV. NEW YORK BLUE SKY LAWS

■ Greenberg Traurig asserts the Investors cannot maintain a private statutory claim for securities fraud under New York law. We agree. New York's Blue Sky Laws, commonly known as the Martin Act, prohibit various fraudulent and deceitful practices in the distribution, exchange, sale, and purchase of securities. *CPC Int'l, Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 519 N.Y.S.2d 804, 806—07, 514 N.E.2d 116, 118 (1987) (citing GEN. BUS. LAW § 352–c). However, unlike the Texas Securities Act, New York's Martin Act provides for neither an express nor an implied private claim. *Pahmer v. Greenberg*, 926 F.Supp. 287, 302 (E.D.N.Y.1996), *aff'd sub. nom Shapiro v. Cantor*, 123 F.3d 717 (2d Cir.1997); *Cohen v. Prudential–Bache Secs., Inc.*, 713 F.Supp. 653, 664 (S.D.N.Y. 1989); *CPC Int'l, Inc.*, 519 N.Y.S.2d at 807, 514 N.E.2d at 118. Instead, New York courts have observed that the purpose of Section 352–c of the Martin Act

> was to create a statutory mechanism in which the Attorney General would have broad regulatory and remedial powers to prevent fraudulent securities prac-

tices by investigating and intervening at the first indication of possible securities fraud on the public and, thereafter, if appropriate, to commence civil or criminal prosecution; and that consistency of purpose with the statute includes consistency with this enforcement mechanism.

*CPC Int'l, Inc.*, 519 N.Y.S.2d at 807, 514 N.E.2d at 119. Thus, the Investors cannot maintain a statutory claim for securities fraud under New York law. Accordingly, we sustain this issue.

## V. STATUTORY FRAUD

Greenberg Traurig also argues that, with the application of New York law, the Investors cannot maintain a claim for statutory fraud under Texas law. We agree. The jury found Greenberg Traurig liable for statutory fraud under Section 27.01 of the Texas Business and Commerce Code. *See* TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 2002). However, in light of our determination that New York law governs this case, the Investors cannot maintain a statutory claim under Section 27.01 of the Texas Business and Commerce Code. Therefore, we sustain this issue.

## VI. COMMON-LAW FRAUD

Greenberg Traurig further asserts it had no duty under New York law to make certain disclosures and, thus, cannot be held liable for common-law fraud. The jury charge on fraud was based on the alleged failure to disclose a material fact. The fraud question further instructed the jury that the duty to disclose a material fact could be based on one of two circumstances. The first is a fiduciary relationship. With respect to a fiduciary relationship, the jury charge provided that a duty to disclose may arise in the following circumstance:

If a relationship of trust and confidence exists between the plaintiff and defendant. Such a relationship exists if the plaintiff justifiably expects the defendant to act in the plaintiff's best interest. A plaintiff's subjective trust and feelings alone do not justify transforming arm's length dealings into a relationship of trust and confidence. To impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit.

With regard to the second circumstance, applicable in the case of an attorney, based on Rule 4.01(b) of the Texas Disciplinary Rules of Professional Conduct, the jury charge stated:

> In representing a client, a lawyer may not knowingly fail to disclose a material fact to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client.[19]

### A. No Duty to Disclose

■ Greenberg Traurig asserts that under New York law, it is not liable for common-law fraud because attorneys have no duty to disclose a client's fraud to a third party in the absence of an attorney-client relationship with the third party. To establish fraudulent concealment under New York law, the plaintiff must show (1) the defendant failed to disclose material information that it had a duty to disclose; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damages as a result of the reliance. *Stolow v. Greg Manning Auctions, Inc.*, 258 F.Supp.2d 236, 248 (S.D.N.Y.2003) (quoting *Bermuda*

*Container Line Ltd. v. International Longshoremen's Assoc., AFL–CIO*, 192 F.3d 250, 258 (2d Cir.1999) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995))).

■ A claim of fraud based on fraudulent omission can be maintained only when the defendant had a duty to disclose the omitted material information. *Frontier–Kemper Constructors, Inc. v. American Rock Salt Co.*, 224 F.Supp.2d 520, 529 (W.D.N.Y.2002); *Schlaifer Nance & Co. v. Estate of Warhol*, 927 F.Supp. 650, 660 (S.D.N.Y.1996), *aff'd*, 119 F.3d 91 (2d Cir.1997); *Morin v. Trupin*, 711 F.Supp. 97, 103 (S.D.N.Y.1989). Under New York law, a duty to disclose in a business transaction arises in three circumstances: (1) when one party makes a partial or incomplete statement that requires clarification; (2) when the parties are in a fiduciary or confidential relationship; and (3) when one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. *Banque Arabe et Internationale D'Investissement*, 57 F.3d at 155; *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *Stolow*, 258 F.Supp.2d at 248; *Manley v. AmBase Corp.*, 126 F.Supp.2d 743, 755–56 (S.D.N.Y.2001).

■ "Historically, fiduciary relationships include: trustee to beneficiary; guardian to ward; agent to principal; attorney to client; executor to legatees or beneficiaries; partner to partner; corporate directors or officers to the corporation; majority shareholders to other shareholders; and bailor to bailee." *Langford v. Roman Catholic Diocese of Brooklyn*, 177 Misc.2d 897, 900 n. 8, 677 N.Y.S.2d

---

**19.** *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 4.01(b), *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9).

436, 438 n. 8 (N.Y.Sup.Ct.1998), *aff'd*, 271 A.D.2d 494, 705 N.Y.S.2d 661 (N.Y.App. Div.2000) (citations omitted). No fiduciary relationship exists between attorneys and third parties in the absence of a contractual relationship between them. *Alpert v. Shea, Gould, Climenko & Casey*, 160 A.D.2d 67, 73, 559 N.Y.S.2d 312, 315 (N.Y.App.Div.1990).

■■■■ A fiduciary relationship may also exist when one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge. *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 529, 724 N.Y.S.2d 66, 68 (N.Y.App.Div.2001); *see also In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 525 (Bankr.E.D.N.Y.1994) (explaining "[f]iduciary relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another"). Generally, an arms-length business transaction does not give rise to a fiduciary duty absent extraordinary circumstances. *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419, 434 (S.D.N.Y.1998); *K.M.L. Labs., Ltd. v. Hopper*, 830 F.Supp. 159, 168 (E.D.N.Y.1993); *see also WIT Holding Corp.*, 282 A.D.2d at 529, 724 N.Y.S.2d at 68 (observing that even though plaintiff and defendant had socialized on several occasions, were business acquaintances, and had worked together on a joint project while part owners of, and working for, different brokerage firms, arm's-length transaction was at issue and therefore no fiduciary relationship existed). Though a confidential relationship may arise between parties to a business relationship, "the requisite high degree of dominance and reliance must have existed prior to the transaction giving rise to the alleged wrong, and not as a result of it." *Societe Nationale D'Exploïtation Industrielle Des Tabacs Et Allumettes v. Salomon Bros. Int'l Ltd.*, 251 A.D.2d 137, 138, 674 N.Y.S.2d 648, 649 (N.Y.App.Div.1998), *appeal denied*, 95 N.Y.2d 762, 715 N.Y.S.2d 215, 738 N.E.2d 363 (N.Y.2000); *Elghanian v. Harvey*, 249 A.D.2d 206, 671 N.Y.S.2d 266 (N.Y.App.Div.1998).

■■■■ Greenberg Traurig did not serve as counsel to the Investors and shared no attorney-client relationship with them. Thus, there was no formal fiduciary relationship between the Investors and Greenberg Traurig giving rise to a duty to disclose. To prevail on a fraud claim premised on a fiduciary duty to disclose in the absence of a formal fiduciary relationship, the Investors must establish that an informal fiduciary relationship existed. However, the Investors have not shown that they had *any* relationship with Greenberg Traurig prior to and apart from their purchase of the IFT stock. Therefore, because no fiduciary relationship, either formal or informal, existed between the parties, Greenberg Traurig had no duty to disclose on that basis.[20]

■■■ If there is no fiduciary relationship, a party has a duty to disclose only

---

20. The law in Texas is the same. The failure to disclose information does not constitute fraud in the absence of a duty to disclose. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Generally, no duty to disclose arises in the absence of a confidential relationship. *Insurance Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998). Fiduciary duties arise as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships. *Id.* In the absence of a formal fiduciary relationship, a confidential relationship may arise when the parties have dealt with each other in such a manner, for a long period of time, that one party is justified in expecting the other to act on its behalf. *Id.* To impose an informal duty in a business transaction, the special relationship must exist prior to, and apart from, the agreement made the basis of the suit. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex.1998).

when one party has superior knowledge not readily available to the other party. *Ceribelli v. Elghanayan,* 990 F.2d 62, 64 (2d Cir.1993). A duty to disclose based on superior knowledge " 'ordinarily arises only in the context of business negotiations where parties are entering a contract.' " *Stolow,* 258 F.Supp.2d at 248 n. 13 (quoting *Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,* 1996 WL 442799, at *5 (S.D.N.Y. Aug.6, 1996)). A duty to disclose will not be imposed unless there is evidence the defendant was on notice that the plaintiff was acting upon a mistaken belief based on inferior information. *Morin,* 711 F.Supp. at 103 (quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 773 (S.D.N.Y. 1985)).

 Under New York law, an attorney has no duty to disclose knowledge that his client is making a fraudulent statement to a third party when there is no attorney-client relationship between the attorney and the third party. *Schlaifer Nance & Co.,* 927 F.Supp. at 661; *see also Calcutti v. SBU, Inc.,* 273 F.Supp.2d 488, 494 (S.D.N.Y.2003) (stating that without independent duty to disclose, mere inaction does not amount to substantial assistance for aider and abettor liability; lawyers do not have duty to "blow the whistle" on their clients); *Morin,* 711 F.Supp. at 113 (holding that claim by third party that attorneys did not "blow whistle on their clients" does not constitute actionable aiding and abetting); *King v. George Schonberg & Co.,* 233 A.D.2d 242, 243, 650 N.Y.S.2d 107, 108 (N.Y.App. Div.1996) (holding that in absence of fiduciary relationship between plaintiff and brother's attorneys giving rise to duty to disclose, attorneys' silence did not amount to substantial assistance required for aider or abettor liability in fraud). More specifically, a law firm is not under an ethical

obligation to disclose what knowledge it might have concerning its client's alleged impending fraud. *National Westminister Bank USA v. Weksel,* 124 A.D.2d 144, 148, 511 N.Y.S.2d 626, 630 (N.Y.App.Div.), *appeal denied,* 70 N.Y.2d 604, 519 N.Y.S.2d 1027, 513 N.E.2d 1307 (N.Y.1987). Indeed, New York Disciplinary Rule 4–101(C)(3) "provides only that 'A lawyer *may* reveal ... the intention of his client to commit a crime ...' " *Id.* at n. * (quoting CODE OF PROF'L RESPONSIBILITY, DR 4–101(C)(3)) (emphasis in original). Thus, under New York law, Greenberg Traurig was under no duty to make any such disclosures to the Investors in the absence of an attorney-client relationship between the law firm and the Investors.

## B. No Private Claim for Violation of Disciplinary Rules

 The court's charge also allowed the jury to find a duty to disclose based on disciplinary rules. Although the violation of the Code of Professional Responsibility may lead to disciplinary proceedings against an attorney, it does not provide a private claim against an attorney under New York law. *Hashemi v. Shack,* 609 F.Supp. 391, 397 (S.D.N.Y.1984); *Shapiro v. McNeill,* 92 N.Y.2d 91, 677 N.Y.S.2d 48, 50, 699 N.E.2d 407, 409 (N.Y. 1998); *Weintraub v. Phillips, Nizer, Benjamin, Krim & Ballon,* 172 A.D.2d 254, 568 N.Y.S.2d 84, 85 (N.Y.App.Div.1991); *Brainard v. Brown,* 91 A.D.2d 287, 289, 458 N.Y.S.2d 735, 736 (N.Y.App.Div.1983), *overruled on other grounds by Santulli v. Englert, Reilly & McHugh, P.C.,* 164 A.D.2d 149, 563 N.Y.S.2d 548 (N.Y.App. Div.1990). Thus, there is no liability for an attorney to third parties outside the traditional tort or contract claims. *See Drago v. Buonagurio,* 46 N.Y.2d 778, 413 N.Y.S.2d 910, 911, 386 N.E.2d 821, 822 (N.Y.1978) ("the courts have not recognized any liability of the lawyer to third

parties therefor where the factual situations have not fallen within one of the acknowledged categories of tort or contract liability"); *Crandall v. Bernard, Overton & Russell,* 133 A.D.2d 878, 879, 520 N.Y.S.2d 237, 238 (N.Y.App.Div.1987), *appeal dism'd, denied,* 70 N.Y.2d 940, 524 N.Y.S.2d 672, 519 N.E.2d 618 (N.Y.1988) (noting that New York does not recognize liability of lawyer to third parties where factual situation does not fall within one of acknowledged categories of tort and contract liability). Therefore, even if Greenberg Traurig had violated a New York disciplinary rule, the Investors still would not be able to maintain a claim for common-law fraud based on such a violation.[21]

We conclude that under New York law, the Investors cannot maintain a fraud claim against Greenberg Traurig for not disclosing any past fraud allegedly committed by IFT or for not revealing that IFT allegedly intended to commit fraud. We sustain this issue.

## VII. CONSPIRACY

■ We now address the Investors' allegations that Greenberg Traurig conspired to commit fraud. Under Texas law,[22] the elements of civil conspiracy are (1) a combination of two or more persons; (2) an object to be accomplished (an unlaw-

ful purpose or a lawful purpose by unlawful means); (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Insurance Co. of N. Am.,* 981 S.W.2d at 675.

## A. Specific Intent

■ " '[C]ivil conspiracy requires specific intent' to agree 'to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.'" *Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex.1996) (quoting *Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716, 719 (Tex.1995)). The gist of civil conspiracy is the injury the conspirators intended to cause. *Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 614 (Tex.1996). Thus, proof of a joint intent to engage in the conduct that resulted in the injury is not sufficient to establish civil conspiracy. *See Juhl,* 936 S.W.2d at 644. Moreover, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement; parties cannot agree, expressly or tacitly, to commit a wrong about which they have no knowledge. *Firestone Steel Prods. Co.,* 927 S.W.2d at 614; *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 857 (Tex.1968).[23]

21. The Investors argued Greenberg Traurig's failure to advise third parties that J. Summers and IFT were involved in fraud violates reasonable standards of minimum attorney conduct as found in Disciplinary Rule 4.01(b). The rule is the same in Texas as in New York. In Texas, the disciplinary rules do not define standards of civil liability of lawyers for professional conduct. TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 15, *reprinted in* TEX. GOV'T CODE ANN. tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar. R. art. X, § 9); *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150 at 159, n. 2. (Tex.2004).

22. As noted in section III., *supra,* Greenberg Traurig asserts there is no difference between

Texas and New York law with respect to conspiracy. Therefore, we apply Texas law to this claim. *See Weatherly,* 905 S.W.2d at 650 (stating burden is on party asserting application of other state's law to establish conflict with Texas law).

23. Similarly, to establish civil conspiracy under New York law, the plaintiff must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties, (2) an overt act in furtherance of the agreement, (3) the parties' intentional participation in the furtherance of a plan or purpose, and (4) resulting damage or injury. *Frazier v. Turning Stone Casino,* 254 F.Supp.2d 295, 313 (N.D.N.Y.2003); *World*

### Jury Charge

Greenberg Traurig contends the trial court erroneously omitted the specific intent requirement from the jury charge and, therefore, the Investors were not required to prove that Greenberg Traurig specifically intended to cause an injury or that it agreed to any unlawful conduct. In instructing the jury on conspiracy, the trial court stated:

A conspiracy is a combination of two or more persons to commit an unlawful act or to commit a lawful act by unlawful means.

To be part of a conspiracy, the conspirator and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to one or more of the Plaintiffs. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Greenberg Traurig complains the charge allowed the jury to conclude that Greenberg Traurig could be part of a conspiracy involving two or more defendants as long as it shared any "common objective or course of action," including a lawful one, "that resulted in damages to one or more of the [Investors]" even if Greenberg Traurig did not intend such a result.

■ Greenberg Traurig, however, did not object at trial to the lack of specific intent in the jury charge. To preserve error, a party must timely object to the submission of an improper question, instruction, or definition. TEX.R. CIV. P. 274. Greenberg Traurig has not cited to any objection it lodged regarding the jury question on conspiracy. Moreover, our review of the record does not reveal that any such objection was raised in the trial court. Therefore, we find Greenberg Traurig has waived this complaint on appeal. *See Melendez v. Exxon Corp.*, 998 S.W.2d 266, 281 (Tex.App.-Houston [14th Dist.] 1999, no writ) (holding appellant, who neither raised objection to instruction during charge conference nor obtained ruling, failed to preserve complaint for appellate review).[24]

*Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F.Supp.2d 514, 532 (S.D.N.Y.2001). Although it is not necessary for the plaintiff to allege and prove that each defendant committed each element of fraud, the plaintiff must establish facts supporting an inference that " 'the defendants knowingly agreed to cooperate in a fraudulent scheme, or shared a perfidious purpose ... [and,] [when] scienter is lacking, the mere fact that a defendant's otherwise lawful activities may have assisted another in pursuit of guileful objectives is not a sufficient basis for a finding that he or she conspired to defraud.' " *Snyder v. Puente Brooklyn Realty Corp.*, 297 A.D.2d 432, 435, 746 N.Y.S.2d 517, 521–22 (N.Y.App.Div. 2002), *appeal denied*, 99 N.Y.2d 506, 755 N.Y.S.2d 712, 785 N.E.2d 734 (N.Y.2003) (quoting *Le Febvre v. New York Life Ins. & Annuity Corp.*, 214 A.D.2d 911, 912—13, 625 N.Y.S.2d 695, 696 (N.Y.App.Div.1995)).

24. Greenberg Traurig asserts additional charge error in that the trial court's charge allowed the jury to find Greenberg Traurig liable for conspiracy on invalid underlying theories of liability, i.e., non-intentional torts—seller and control person liability under the Texas Securities Act, as well as on valid theories of liability, i.e., intentional torts such as fraud, thereby rendering it impossible to determine whether the jury based its finding of civil conspiracy on a valid or an invalid theory of liability. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex.2000) (holding that when trial court submits single broad-form liability question incorporating multiple theories of liability, error is harmful and new trial is required when reviewing court cannot determine whether jury based its verdict on improperly submitted invalid theory). We have concluded New York law applies to the Investors' fraud-based claims and the Investors cannot maintain a claim for statutory securities fraud; therefore, it is not necessary for us to address whether the jury charge based conspiracy liability on both a

### Legal Sufficiency

Greenberg Traurig also complains the evidence is legally insufficient to support the jury's finding on conspiracy to defraud.[25] When reviewing the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the jury's findings, and disregard all contrary evidence and inferences. *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex.2003) (per curiam). A no-evidence challenge will be sustained when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998). A no-evidence point will be rejected if more than a scintilla of evidence supports the finding. *Canchola*, 121 S.W.3d at 739. More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. National Union Fire Ins. Co. of Pittsburgh, P.A.*, 77 S.W.3d 253, 262 (Tex.2002).

Greenberg Traurig claims it cannot be held liable for conspiracy based on the failure to disclose client confidences. Under Texas law, an attorney can be held liable for conspiracy to defraud if he knowingly agrees to defraud a third person.

*Mendoza v. Fleming*, 41 S.W.3d 781, 787 (Tex.App.-Corpus Christi 2001, no pet.); *Querner v. Rindfuss*, 966 S.W.2d 661, 666 (Tex.App.-San Antonio 1998, pet. denied); *Bernstein v. Portland Savs. & Loan Ass'n*, 850 S.W.2d 694, 706 (Tex.App.-Corpus Christi 1993, writ denied), *overruled on other grounds by Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex.App.-Houston [1st Dist.] 1985, no writ). When an attorney, acting for his client, participates in fraudulent activities, his conduct is "foreign to the duties of an attorney." *Poole v. Houston & T.C. Ry. Co.*, 58 Tex. 134, 137 (1882). "Evidence of an attorney's knowledge of the fraudulent nature of his and others' actions and intent to share in the fruits of that fraud can defeat a claim that the attorney was ignorant of fraud and acting solely at the clients' direction and can expose the attorney to liability for conspiracy to defraud." *Bernstein*, 850 S.W.2d at 706. However, mere knowledge and silence are not sufficient to establish conspiracy. *Id.* Instead, because of the attorney's duty to preserve client confidences, there must be some indication that the attorney agreed to the fraud. *Id.*

The Investors claim Greenberg Traurig entered into an agreement to accomplish a legal purpose (an initial public offering) by illegal means, which they claim involved bringing other lawyers, auditors, and investment bankers (necessary to create the illusion of a forthcoming initial public offering) into IFT's service.

---

valid theory of liability, such as fraud, or on an allegedly invalid theory of liability, such as seller and control person liability, under the Texas Securities Act.

**25.** Greenberg Traurig also complains the evidence is factually insufficient to support the jury's finding of civil conspiracy. Although our disposition of Greenberg Traurig's issue

on the expert testimony will require a remand on the Investors' claim that Greenberg Traurig conspired to defraud them, we must consider Greenberg Traurig's issues requesting a rendition before ordering a remand. *See* Tex. R.App. P. 43.3; *Lone Star Gas Co. v. Railroad Comm'n of Tex.*, 767 S.W.2d 709, 710 (Tex. 1989) (per curiam).

The Investors further claim Greenberg Traurig entered into a second agreement to accomplish an illegal purpose (fraudulently obtaining cash to sustain IFT), which involved assisting J. Summers in his scheme to defraud investors by concealing his past, preparing various documents, and using the illusion of an impending initial public offering. In support of their contention that Greenberg Traurig conspired to defraud them, the Investors rely on Greenberg Traurig's alleged knowledge of, but failure to disclose, J. Summers' and IFT's prior and then current problems, certain of which would prevent the initial public offering from ever occurring.

*SEC Injunction*

The Investors assert Greenberg Traurig knew of the SEC injunction permanently enjoining J. Summers from selling unregistered securities. Kirshenberg testified he did not know about the SEC injunction until February 1998, when Ernst & Young informed him after discovering it while conducting its due diligence on IFT.

At trial, however, documents from Arthur Andersen's files were admitted into evidence, one of which included a February 11, 1980 release concerning an SEC action against J. Summers alleging that he, among others, had sold unregistered securities in violation of the registration provisions of federal securities law. On June 5, 1996, a copy of the SEC release was faxed to Thomas Duffy of Arthur Andersen from another Arthur Andersen employee. Thus, by June 1996, Arthur Andersen knew J. Summers had problems with the SEC. In the October 14, 1996 Arthur Andersen termination letter, Duffy made reference to "two matters which surfaced during the conduct of [Arthur Andersen's] due diligence" which previously had discussed with J. Summers in July

1996. Kirshenberg testified that in November 1996, Greenberg Traurig partner Richard Zaroff spoke to Arthur Andersen on behalf of IFT in an effort to get Arthur Andersen to reconsider terminating its relationship with IFT. Kirshenberg conducted a Westlaw computer search on the same day Zaroff spoke to Arthur Andersen. The Investors assert Kirshenberg searched Westlaw for the SEC injunction. Kirshenberg testified his research could have been related to either the trademark matter Greenburg Traurig was then handling or the Mississippi lawsuit mentioned in the Arthur Andersen termination letter.

Moreover, on October 30, 1996, about the time that Greenberg Traurig's representation of IFT commenced, J. Summers wrote Zaroff, "[w]e would like to move forward on cleaning up the *'old baggage'* and working on the [initial public offering]." [26] The jury reasonably could have inferred from the evidence that Greenberg Traurig knew of the SEC injunction from speaking with Arthur Andersen and from J. Summers' disclosure of "old baggage."

*Sale of Securities in Violation
of Securities Laws*

Related to Greenberg Traurig's knowledge that J. Summers was permanently enjoined from selling unregistered securities is the Investors' assertion that Greenberg Traurig knew J. Summers was selling unregistered securities, i.e., IFT stock, in violation of the SEC injunction. Kirshenberg testified he did not know J. Summers was selling stock in IFT until February 1998. Kirshenberg also testified he first became aware of J. Summers' sales of stock in IFT when the lawsuit in Maine was filed in late spring or early summer of 1998.

26. Emphasis added.

The Investors argue Kirshenberg knew J. Summers was selling unregistered securities because of Kirshenberg's own ownership of stock in IFT and its two predecessor companies, AquaTech and Nutritech. Kirshenberg purchased 17,500 shares in AquaTech in 1991; after AquaTech went into bankruptcy, Kirshenberg was issued 17,500 shares in Nutritech in 1993; after Nutritech failed, Kirshenberg was issued 17,500 IFT shares in 1994. In a letter dated September 20, 1996, J. Summers announced to IFT shareholders that they had "voted overwhelmingly" to increase IFT's shares from 25 million to 30 million. The letter further stated that each IFT shareholder was being granted "rights to buy additional shares, up to 5% of your present holdings at $5.00 per share."

The Investors also contend Greenberg Traurig knew there were too many unaccredited investors for a nonpublic company.[27] According to J. Summers' testimony, Kirshenberg "knew all along how many shareholders there were." J. Summers stated that the IFT shareholder list was accessible to "the lawyers," and "Kirshenberg's firm" wanted copies of all of IFT's files. Kirshenberg testified the first time he saw the IFT shareholder list was when IFT's Tyler Carlucci showed it to him in October 1998. Kirshenberg, however, also testified that he knew there were anywhere from 500 to 1,000 IFT shareholders "from the beginning of the engagement." Finally, the notes to the report on the audited financial statements for the fiscal year ending March 31, 1996, issued in spring of 1997, state IFT's stock "may have been issued without compliance with or exemption from certain securities regis-

tration and disclosure acts." Greenberg Traurig billing records indicate that the law firm reviewed the audited reports for IFT's financial statements. A March 20, 1997 Greenberg Traurig billing entry states, "Review of Audit Report and Financial Statements issued by Parente Randolph." A March 21, 1997 Greenberg Traurig billing entry similarly states, "Conference with Payette-continuing review of financial statements and related issues."

Based on the above-cited evidence, the jury reasonably could have inferred Greenberg Traurig knew that J. Summers was selling unregistered securities in violation of the SEC injunction and that IFT had too many shareholders for a nonpublic company.

### Cost of IFT's Rescission Offer

The Investors assert Greenberg Traurig knew of the original $16 million figure initially estimated as the amount necessary to pay for the rescission offer, which was a substantial liability against IFT. The Investors argue Greenberg Traurig knew that unless IFT dealt with the $16 million liability, the company would not be able to obtain a "clean" auditor's opinion necessary for an initial public offering.

In a July 7, 1997 memorandum to J. Summers, Gerald Chalphin of the Ellsworth Wiles law firm stated that IFT would have to make a rescission offer to its current shareholders, suggesting that IFT should set aside more than $16 million to cover the cost of the rescission offer.[28] Several months later, on December 9, 1997, Chalphin wrote to J. Summers, set-

---

27. *See* 17 C.F.R. §§ 230.505–.506 (2004).

28. Chalphin's July 7, 1997 memo stated: "Based on the information at hand, we estimate that the Company should set aside (or have available to it) an aggregate amount of approximately $16,834,000 (representing $14,569,528 in estimated aggregate original invested funds, together with interest) to fund the rescission offering."

ting forth the rescission offer amount as $110,000, and explaining:

> [w]ith the exception of sixteen investors who we understand are still considering whether or not to accept the rescission offers which were made to them (at what we understand IFT believes will be an aggregate potential cost to it of less than $110,000), we understand that each of those investors chose to reject the rescission offer which was made to them.

Chalphin's letter makes no mention of the previous $16 million figure. Two days later, J. Summers faxed to Kirshenberg a copy of Chalphin's December 9, 1997 letter setting forth the $110,000 rescission offer amount, and requested that Kirshenberg review it and give J. Summers his thoughts.

The Investors assert it is reasonable to infer that because J. Summers forwarded the letter regarding the $110,000 figure, Greenberg Traurig also received a copy of the memo setting forth the $16 million figure. The Investors also assert Greenberg Traurig knew of the original $16 million rescission offer figure because J. Summers testified that he discussed "everything" with Kirshenberg and forwarded all documents to Greenberg Traurig. The jury could have made the reasonable inference that, based on Greenberg Traurig's relationship with IFT, the law firm knew of the original $16 million estimated rescission offer amount and that any discussion of the December 9, 1997 letter would necessarily include a discussion of the previous $16 million figure.

### Efforts to Help IFT Secure an Underwriter, Independent Auditor, and Financing

The Investors also complain that Greenberg Traurig helped IFT find an independent auditor and underwriter, and helped

secure financing and, through these efforts, attempted to keep the possibility of an initial public offering alive even though it knew that an initial public offering could not occur. Greenberg Traurig does not dispute that it was involved in efforts to find an independent auditor and an underwriter for the initial public offering and to assist IFT in securing financing, but maintains that these efforts were only a part of its duties in representing IFT. However, Kirshenberg did not necessarily inform those potential independent auditors, underwriters, or lenders of IFT's or J. Summers' problems.

In late 1997 and early 1998, Kirshenberg assisted IFT in trying to get Ernst & Young on board as IFT's independent auditor. Ernst & Young was no longer interested after discovering the SEC injunction while conducting its due diligence on IFT. In March 1998, Kirshenberg contacted Bear Stearns & Co., an investment house, on behalf of IFT to discuss the possibility of it underwriting the initial public offering. Kirshenberg testified that he did not tell Bear Stearns about the SEC injunction or that Arthur Andersen had resigned due to J. Summers' failure to disclose information, but instead, he informed Bear Stearns that there were some problems with J. Summers' "checkered past" and a new CEO would be stepping in to replace him.

In the spring of 1998, Greenberg Traurig introduced investment bank, Josephthal Co., as a potential underwriter of IFT's initial public offering. In August 1998, Greenberg Traurig assisted IFT in obtaining a loan from the Bank of Pennsylvania. Greenberg Traurig, in an opinion letter to the bank, represented that there were no existing or pending actions against IFT that would adversely affect

the company.[29] Finally, in the summer and fall of 1998, when another Greenberg Traurig client was interested in buying IFT, Greenberg Traurig asked IFT to sign a waiver of conflict of interest so that Greenberg Traurig could proceed with its attempt to negotiate the sale.

### Arthur Andersen's Resignation

The Investors also complain about Greenberg Traurig's knowledge that Arthur Andersen had resigned as IFT's independent auditor due to J. Summers' failure to disclose a judgment taken against him in Mississippi. In an October 14, 1996 letter, Thomas Duffy of Arthur Andersen explained to J. Summers:

> In July 1996, I met with you and Robert [Summers] to discuss two matters which surfaced during the conduct of our due diligence related to acceptance of Integrated Food Technologies Corp. (IFT) as a client of our Firm. In the course of those discussions, I asked both you and Robert if there were any other matters which I should be aware of to which both of you responded there were none. I am extremely disappointed to have just learned of another matter (Aqua–Culture Technologies LTD. [J. Summers] v. Dr. Sandra Holly, Supreme Court of Mississippi, May 30, 1996).
>
> An independent auditor, out of necessity, places significant reliance on representations of client management. Consequently, when serious doubts are raised as to the completeness of such representations, there is no basis for a

mutually beneficial professional relationship. As a result, effective immediately, we hereby resign as IFT's independent public accountants and tax advisors....

On May 30, 1996, the Mississippi Supreme Court, which is mentioned in the Arthur Andersen resignation letter, affirmed a judgment against J. Summers in a derivative shareholder lawsuit in which it was found that J. Summers had violated his fiduciary duties and diverted corporate funds for his own use. *See Aqua–Culture Techs., Ltd. v. Holly*, 677 So.2d 171 (Miss. 1996) (the "*Holly* case"). IFT specifically asked Greenberg Traurig to speak to Arthur Andersen in an attempt to keep the accounting firm from resigning as IFT's independent auditor. Greenberg Traurig also edited the script for the November 23, 1996 annual shareholders meeting, suggesting that with regard to Arthur Andersen's status as IFT's independent auditor, IFT's board members state to the shareholders, "[W]e have encountered some difficulty with the Andersen group and are exploring a number of ways to proceed with them or another big 6 firm."

### Various Lawsuits against J. Summers and IFT

The Investors further complain that Greenberg Traurig knew about other lawsuits brought against J. Summers and IFT in Mississippi, Oklahoma, and Maine. It is undisputed that Greenberg Traurig knew of the Mississippi and Maine lawsuits.[30] Greenberg Traurig, however, dis-

---

**29.** Greenberg Traurig's opinion letter to the Bank of Pennsylvania stated, in relevant part:

> To our knowledge, without investigation, there is not an existing, threatened or pending action against or affecting the Borrower or Pledgor which would have a material adverse effect upon it/them or upon the Mortgaged Premises (Pennsylvania Proper-

ty) and (Maine Property) or its contemplated uses.

**30.** Greenberg Traurig knew about the Mississippi lawsuit because it was J. Summers' failure to disclose that lawsuit and judgment that ultimately resulted in Arthur Andersen's terminating its agreement to audit IFT's financial statements. In May 1998, J. Summers and IFT were sued in Maine for issuing stock

putes that it had any knowledge about the Oklahoma lawsuit until October or November 1998, the time period during which Kirshenberg claims to have learned of it. In 1997, IFT and J. Summers were sued in Oklahoma over "the acquisition by the Plaintiffs of certain shares of stock . . . in IFT . . ." J. Summers testified that the Gross McGinley law firm, not Greenberg Traurig, handled the settlement of the Oklahoma lawsuit, but that he was certain he had discussed the Oklahoma lawsuit with Kirshenberg "[b]ecause we discussed everything with Mr. Kirshenberg." There is evidence to support the Investors' assertion that Greenberg Traurig knew of the Oklahoma lawsuit.

### J. Summers' Personal Bankruptcy

The Investors contend Greenberg Traurig knew that J. Summers had filed for personal bankruptcy. In its opinion affirming the judgment against J. Summers in the *Holly* case, the Mississippi Supreme Court observed that J. Summers was granted a discharge in his personal bankruptcy case on November 8, 1995. *See Holly*, 677 So.2d at 186. Although Kirshenberg testified that he first learned of J. Summers' personal bankruptcy in the context of the present litigation, he also testified that he had read the opinion in the *Holly* case early in Greenberg Traurig's representation of IFT. J. Summers also testified that he discussed his personal bankruptcy with Kirshenberg. The jury reasonably could have concluded that Kirshenberg knew J. Summers had filed for personal bankruptcy.

### Failures of Predecessor Companies

The Investors complain of Greenberg Traurig's knowledge that IFT's predeces-

sor companies had failed. Kirshenberg testified that he knew that AquaTech had gone into bankruptcy before becoming Nutritech, and that Nutritech had folded before becoming IFT. The jury reasonably could have concluded that Greenberg Traurig knew that IFT's predecessor companies had failed.

### Disgruntled IFT Shareholders

The Investors complain that Greenberg Traurig knew that a group of disgruntled IFT shareholders had accused J. Summers of fraud. On October 18, 1996, a group of IFT shareholders informed J. Summers that his representations regarding IFT's financial position were not true and requested that their investments be refunded, or they would take further action:

One year ago you provided information, verbal and written which indicated that IFT was in a strong position and would be proceeding quickly to set up full-scale production facilities in Pennsylvania and in Germany, and you personally confirmed that construction had begun in Germany. The plans and financial statements which were presented to us in September 1995 to use as [a] basis for the decision to invest in IFT (Business Plan R23–1995) showed over $14MM of booked orders (receivables) and well over $2MM in stated profits for fiscal year 3/95. Over the past year we have learned that none of the above was true when it was presented to us. In fact, is still only "potential," as we have determined from discussions with you, Stan Kron, Don Shoflick, and Joe Barone.

We have repeatedly requested realistic updates on the company's progress. We have waited for over six months to see

---

in violation of Maine securities laws. Kirshenberg represented IFT in the settlement of

that lawsuit.

the FY 96 financial statements, to no avail.

In view of our disappointment, and in view of the manner in which our investment in your company was solicited, we feel that our money should be refunded immediately, with interest. Please send a check made out to each of the undersigned, . . .

Once we receive the funds, we will consider this matter closed. If we do not receive the refunds by October 31, we will retain counsel to pursue further action and more substantial relief, to the fullest extent of the law, based on the improprieties and misrepresentations which we believe were committed by IFT.

Greenberg Traurig does not dispute that it knew of the disgruntled IFT shareholders. Kirshenberg testified that IFT brought the disgruntled shareholders' problem to Greenberg Traurig's attention. On October 30, 1996, J. Summers sent to Greenberg Traurig partner Richard Zaroff a copy of his proposed response to the disgruntled shareholders' demands, asking for Zaroff's comments and further stating, "We have no problem rescinding the stock without interest because it is selling at a higher price now anyway."[31] Kirshenberg and Zaroff worked to resolve the problems with the disgruntled shareholders.

### Greenberg Traurig's Knowledge of Work Other Law Firms Were Performing

Greenberg Traurig maintains that in early 1997, the only legal work it was performing for IFT was work on a litigation trademark matter. The Investors claim that by early 1997, Greenberg Traurig had assumed a supervisory role over other law firms hired by IFT to act as general counsel (Gross McGinley) and to handle SEC matters (Ellsworth Wiles). For example, in December 1997, J. Summers sent to Kirshenberg a copy of a memo from Ellsworth Wiles regarding the $110,000 rescission offer figure. J. Summers testified that he discussed with Kirshenberg the work Ellsworth Wiles was performing: "I discussed it with him because I was anxious to get this SEC matter cleared up once and for all because everybody agreed it was too broad and it should be eliminated." According to J. Summers, Kirshenberg told him to just let Ellsworth Wiles continue handling the SEC matter instead of Greenberg Traurig taking it over. The Investors also rely on J. Summers' testimony that Greenberg Traurig received copies of all the records and files, and that he discussed "almost everything" with Kirshenberg because "Kirshenberg was sort of a legal confidant." The jury reasonably could have inferred that Greenberg Traurig was aware of the legal work the other law firms were performing for IFT.

### Analysis

██ The Texas Supreme Court has explained that it is not sufficient that the alleged conspirators intended to engage in the conduct that resulted in the injury.

---

**31.** The draft letter to the disgruntled IFT shareholders stated:

We are sorry that you are disappointed with IFT. You are the only stockholders who have voiced dissatisfaction. We cannot answer for each and every projection that was shown to you. Things change and modify. In our case it has all been for the better, albeit not exactly as projected.

The 1996 audit was not as fast as we anticipated. Unfortunately, we had IPO considerations to interface with it, including selection of auditors, etc. We are willing to rescind your original stock to you at the price you paid (we cannot pay interest). We are prepared to do so on or before 15 November 1996.

*Triplex Communications, Inc.,* 900 S.W.2d at 719. Rather, to recover on their claim for conspiracy to defraud, the Investors were required to show that Greenberg Traurig specifically intended to agree to accomplish an unlawful purpose or lawful purpose by unlawful means. *See Juhl,* 936 S.W.2d at 644. However, because of an attorney's duty to preserve client confidences, there must be "indications" that the attorney agreed to the fraud. Thus, an attorney may be held liable for conspiracy to defraud if he knowingly agrees to defraud a third party. *Bernstein,* 850 S.W.2d at 706. Although conspiracy may be proved by circumstantial evidence, "a vital fact may not be established by piling inference upon inference." *Schlumberger Well Surveying Corp.,* 435 S.W.2d at 858.

The Investors assert there was (1) an agreement to accomplish a legal purpose (an initial public offering) by illegal means—bringing other lawyers as well as auditors and investment bankers (necessary to create the illusion of a forthcoming initial public offering) into IFT's service and (2) an agreement to accomplish an illegal purpose (fraudulently obtaining funds to sustain IFT)—assisting J. Summers in his scheme to defraud investors by concealing his past, preparing various documents, and using the illusion of an impending initial public offering.

The jury heard evidence from which it reasonably could have inferred that Greenberg Traurig knew (1) J. Summers was prohibited from selling unregistered securities by the SEC injunction; (2) J. Summers was selling unregistered securities in violation of the SEC injunction; (3) there were more shareholders in IFT than were allowed for a nonpublic company; and (4) a recision offer was necessary because unregistered securities had been sold in violation of the SEC injunction.

There was also evidence that Greenberg Traurig knew of other lawsuits against IFT and of J. Summers' personal bankruptcy and the failures of the predecessor companies. Greenberg Traurig knew Arthur Andersen had resigned as IFT's independent auditor because of J. Summers' failure to disclose a judgment against him, and other IFT shareholders had accused J. Summers of fraud. It was undisputed that Greenberg Traurig assisted IFT in trying to find an independent auditor, a lender, and an investment banker to move forward with an initial public offering, without necessarily disclosing J. Summers' problems with the SEC, other IFT shareholders, past bankruptcies, or failures of predecessor companies.

Finally, even after IFT's Tyler Carlucci and Daniel Moran discovered IFT had more shareholders than allowed for a nonpublic company, which subsequently led to the discovery of J. Summers' other problems, Kirshenberg did not want to take the information to the SEC. Moran testified that when he suggested they go to the SEC, Kirshenberg told him that Moran would be held liable if IFT went into bankruptcy or anything else that occurred because of going to the SEC.

Considering only evidence and inferences supporting the jury's finding, we conclude there is more than a scintilla of evidence to support a finding that Greenberg Traurig agreed to conspire to commit common-law fraud.

### B. Cause of Damages

Though some defendants were dismissed on jurisdictional grounds, the remaining individual defendants found to be part of the conspiracy did not appear at trial and have never challenged any allegation or finding that a civil conspiracy existed. Greenberg Traurig contends the evidence is legally insufficient to prove that any

alleged common objective or course of action resulted in damages to any of the Investors. More specifically, Greenberg Traurig argues nothing it did in late 1996 caused the Investors to invest in IFT a year later because by the spring of 1997, (1) IFT's directors were aware of IFT's noncompliance with securities law; (2) IFT's shareholders had been informed of the noncompliance in the company's 1996 annual report (although not the amount of potential liability); and (3) IFT had engaged the Gross McGinley law firm to bring the company into compliance, and the Ellsworth Wiles law firm to handle the rescission offer.

An alleged conspirator is not liable for an act not performed in furtherance of the conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979). However, once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Akin v. Dahl,* 661 S.W.2d 917, 921 (Tex. 1983); *In re Arthur Andersen, LLP,* 121 S.W.3d 471, 482 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding). A finding of civil conspiracy further imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Carroll,* 592 S.W.2d at 925. "[C]ivil conspiracy 'came to be used to extend liability in tort ... beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.'" *Id.* at 925–26 (quoting W. Prosser, HANDBOOK OF THE LAW OF TORTS § 46, at 293 (1971)).

The evidence is legally sufficient to support a finding that Greenberg Traurig agreed to be a part of the civil conspiracy to commit common-law fraud. Specifically, the jury heard evidence that Greenberg Traurig (1) knew of J. Summers' myriad of problems with the SEC, other IFT shareholders, and personal bankruptcy, (2) knew of IFT's financial position and potential liability due to the necessity of the rescission offer, (3) knew that predecessor companies of IFT had failed, and (4) actively pursued financing for IFT and underwriting for the initial public offering. The jury also heard evidence of J. Summers' misrepresentations to the Investors with regard to the status of the impending initial public offering, IFT's financial health, how the funds invested would be used, and which investment bank allegedly would be underwriting the initial public offering. After reviewing all evidence and inferences in favor of the jury's findings, we conclude the evidence is legally sufficient to support a finding that Greenberg Traurig was part of a civil conspiracy and that fraudulent acts that caused damage to the Investors were committed by coconspirators in furtherance of the conspiracy.

## VIII. EXPERT TESTIMONY

Greenberg Traurig contends the trial court erred in admitting expert testimony about the law. The Investors presented expert testimony through Joseph Long, a former securities law professor from the University of Oklahoma College of Law, and James P. Wallace, a former Justice of the Texas Supreme Court.

### A. Motion to Strike

As an initial matter, the Investors assert that Greenberg Traurig did not properly object at trial to the majority of the Investors' experts' testimony and, therefore, did not preserve error. The Investors contend that although Greenberg Traurig filed a pretrial "Defendant's Motion to Strike Plaintiffs' Designation of Professor Joe Long and Justice James Wallace as Expert Witnesses," the law firm failed to preserve error because it did not object to the experts' testimony when such testimo-

ny was offered during trial. Thus, the crux of the Investors' argument is that Greenberg Traurig's pretrial motion to strike was essentially a motion in limine and should be treated as such.

■ A motion in limine is a procedural device that permits a party to identify, prior to trial, certain evidentiary rulings the trial court may be asked to make. *Weidner v. Sanchez*, 14 S.W.3d 353, 363 (Tex.App.-Houston [14th Dist.] 2000, no pet.). The purpose of the motion in limine is to prevent the other party from asking prejudicial questions or introducing prejudicial evidence in front of the jury without first asking the trial court's permission. *Hartford Acc. & Indem. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex.1963); *Weidner*, 14 S.W.3d at 363. Because a trial court's ruling on a motion in limine preserves nothing for review, a party must object at trial when the testimony is offered to preserve error for appellate review. *Hartford Acc. & Indem. Co.*, 369 S.W.2d at 335. However, not all pretrial motions are motions in limine. *See Huckaby v. A.G. Perry & Son, Inc.*, 20 S.W.3d 194, 203 (Tex. App.-Texarkana 2000, pet. denied). There is a distinction between a motion in limine and a pretrial ruling on admissibility. *Id.*; *see also Norfolk S. Ry. Co. v. Bailey*, 92 S.W.3d 577, 583 (Tex.App.-Austin 2002, no pet.) (stating that "[a] ruling on a pretrial motion to exclude evidence ... can be a ruling on the admission of evidence"). The trial court has the authority to make a pretrial ruling on the admissibility of evidence. *Huckaby*, 20 S.W.3d at 203; *Owens–Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 557 (Tex.App.-Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (1998).

The Investors argue a pretrial motion to exclude testimony is actually treated as a motion in limine. In support of this contention, the Investors rely on *Clark v. Trailways, Inc.*, 774 S.W.2d 644 (Tex. 1989). *Trailways* involved sanctions imposed for failing to timely supplement responses to discovery requests. *Id.* at 645. The issue was whether the party opposing the admission of certain testimony under former Texas Rule of Civil Procedure 215(5) preserved its complaint for appeal by objecting to the trial court. The trial court denied the opposing party's motion for sanctions, which included an objection to the testimony of an undisclosed witness; no objection was made during trial when the testimony was offered. *Id.* at 647. The *Trailways* court held the pretrial motion for sanctions did not preserve error as to the admission of the testimony in the absence of any objections having been lodged when the testimony was offered. *Id.* at 647—48.

The *Huckaby* court considered whether the ruling in *Trailways* applies to all pretrial matters. 20 S.W.3d at 205. Distinguishing *Trailways*, the court of appeals in *Huckaby* noted that *Trailways* involved discovery sanctions. *Id.* Texas Rule of Civil Procedure 166 provides that a trial court may hold a pretrial conference to consider written trial objections to exhibits or other such matters as may aid in the disposition of the action. *Id.* (citing Tex.R. Civ. P. 166(m), (p)).[32] In such a pretrial

---

**32.** Rule 166 provides, with regard to pre-trial conferences, in relevant part:

In an appropriate action, to assist in the disposition of the case without undue expense or burden to the parties, the court may in its discretion direct the attorneys for the parties and the parties or their duly authorized agents to appear before it for a conference to consider:

hearing, the trial court can make an order that recites the action taken, and the order shall control the subsequent course of the case unless modified at trial to prevent manifest injustice. *Id.* Therefore, Rule 166 suggests that pretrial rulings are appropriate, but does not suggest that it is necessary to go through the same procedure during the course of the trial. *Id.* Consequently, the *Huckaby* court held the trial court's ruling on the pretrial motion to exclude evidence properly preserved error at the time the evidence was admitted. *Id.* at 206.

 In its motion to strike Professor Long as a testifying expert, Greenberg Traurig argued that Professor Long's expert report was based on questions of pure law and his opinions were contrary to this court's opinion in *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Professor Long's expert report addressed issues related only to the Texas Securities Act: (1) whether IFT made material misrepresentations and omissions in connection with the sale of IFT securities, (2) whether IFT was liable to the Investors for misrepresentations and omissions under the Texas Securities Act, and (3) whether the defendants, other than IFT, were liable under the Texas Securities Act for misrepresentations and omissions by IFT.

A review of the record in this case reveals that after the trial court heard oral arguments on the parties' motions in limine and the voir dire of the jury on October 30, 2001, it heard Greenberg Traurig's motion to strike Professor Long's testimony the next day, October 31, 2001.[33] At that hearing, Greenberg Traurig argued Professor Long's testimony (1) involved questions of law, (2) was not reliable because it failed to follow precedent, and (3) would not assist the jury because it is the role of the trial court to instruct the jury on the law. After hearing arguments, the trial court denied Greenberg Traurig's motion to strike Professor Long as a testifying expert.[34] In any event, Greenberg Traurig further objected to Professor Long's testimony and the introduction of certain exhibits at trial. The trial court also overruled these trial objections.

Later in the trial proceedings, the trial court heard argument on Greenberg Traurig's motion to strike former Justice Wallace as a testifying expert.[35] In this motion, Greenberg Traurig argued the former Texas Supreme Court justice's testimony was not admissible because (1) his opinions concerned malpractice and professional negligence, neither of which had been alleged against Greenberg Traurig, and therefore, were irrelevant; (2) his opinions on duty (even if negligence were at issue) are purely on questions of law; and (3) his opinions on the duty to disclose are based

(m) Written trial objections to the opposite party's exhibits, stating the basis for each objection;

\* \* \*

(p) Such other matters as may aid in the disposition of the action ... [S]uch order when issued shall control the subsequent course of action, unless modified at the trial to prevent manifest injustice.

Tex.R. Civ. P. 166.

**33.** The trial court specifically stated, "On the Motion to Strike, 15 minutes for each side?"

**34.** The trial court expressly stated, "I'm going to deny your Motion to Strike Professor Long."

**35.** The following exchange took place:

MR. BRUNS [counsel for Greenberg Traurig]: Ready, your Honor. I think Wallace is next up. May I proceed with my Motion to Strike Justice Wallace?

THE COURT: Yes. And I have the Motion to Strike and the responses. So, you don't have to be too detailed.

on incorrect law, i.e., Texas disciplinary rules rather than New York disciplinary rules. In his expert report, which consists of only two pages, former Justice Wallace opined:

> Based on my review, the above documents, my experience and knowledge of law acquired over forty plus years of active law practice and Judicial experience, it is my opinion that the law firm of Greenberg, Taurig, P.C. [sic] and the individual lawyers involved in this matter were *negligent* in not informing the various investors including Robert Moody, Jr., and Daniel Moran of the various acts and wrong doing [sic] of Jack Summers, Robert Summers and Integrated Food Technologies Corporation as reflected in the above listed documents.[36]

At the hearing on Greenberg Traurig's motion to strike the testimony of these experts, Greenberg Traurig objected to former Justice Wallace's testimony because it (1) was based purely on questions of law, (2) was unreliable because it was inconsistent with Texas law, and (3) would not assist the jury. The trial court denied Greenberg Traurig's motion.[37] Moreover, during former Justice Wallace's testimony at trial, Greenberg Traurig again objected, but the trial court overruled those objections as well.

We find that Greenberg Traurig has preserved error with regard to its objections to the expert testimony of both Professor Long and former Justice Wallace. *See* Tex.R. Evid. 103(a) (stating "[e]rror may not be predicated upon a ruling which admits ... evidence unless ... a timely objection or motion to strike appears of record, stating the specific ground of ob-

jection, if the specific ground was not apparent from the context" and stating "[w]hen the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections"). Accordingly, we now consider whether the trial court erred in admitting this evidence.

### B. Standard for Admissibility of Expert Testimony

■ The admission of expert testimony is reviewed under the abuse-of-discretion standard. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex.2002). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K–Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex.2000) (per curiam).

■ The Texas Rules of Evidence provide for the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex.R. Evid. 702. Thus, for an expert's testimony to be admissible, the expert must be qualified and the expert's opinion must be relevant to the issues in the case and based upon a reliable foundation. *Zwahr*, 88 S.W.3d at 628.

---

**36.** Emphasis added.

**37.** The trial court stated, "I'm going to deny your motion, Mr. Bruns.... I'm going to al-

low Justice Wallace to go into the ethical issues also."

## C. Questions of Law

Greenberg Traurig asserts the trial court erred in allowing the expert testimony of Professor Long and former Justice Wallace because these witnesses testified on pure questions of law. The Investors assert Professor Long and former Justice Wallace merely testified on mixed questions of law and fact.

■■■■ An expert may state an opinion on a mixed question of law and fact if the opinion is limited to the relevant issues and is based on proper legal concepts. *GTE Southwest, Inc. v. Bruce,* 998 S.W.2d 605, 619–20 (Tex.1999). An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard. *Mega Child Care, Inc. v. Texas Dep't of Protective & Regulatory Servs.,* 29 S.W.3d 303, 309 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Expert testimony on a mixed question of law and fact must meet the requirements applicable to expert testimony generally, i.e., it must be helpful to the trier of fact as required by Texas Rule of Evidence 702. *Louder v. De Leon,* 754 S.W.2d 148, 149 (Tex.1988) (per curiam); *Lyondell Petrochemical Co. v. Fluor Daniel, Inc.,* 888 S.W.2d 547, 554 (Tex.App.-Houston [1st Dist.] 1994, writ denied). An expert, however, may not testify on pure questions of law. *Mega Child Care, Inc.,* 29 S.W.3d at 309. Thus, an expert is not allowed to testify directly to his understanding of the law, but may only apply legal terms to his understanding of the factual matters in issue. *Welder v. Welder,* 794 S.W.2d 420, 433 (Tex.App.-Corpus Christi 1990, no writ).

Greenberg Traurig raises complaints on appeal with regard to Professor Long's and former Justice Wallace's testimony concerning the Investors' claims for alleged violations of the Texas Securities Act, fraud, and conspiracy. In view of our disposition of the Investors' claims under the Texas Securities Act, we need only address the expert testimony as it relates to conspiracy to commit common-law fraud and the underlying tort of common-law fraud.

■■■■ Our review of the record reveals many instances in which Professor Long testified on questions of law concerning fiduciary duties and conspiracy. First, the Investors' trial counsel read from and questioned Professor Long about the trial court's opinion in the *Holly* case, which cited Justice Cardozo's discussion of duties owed by a fiduciary:

> Corporate officers and directors as fiduciaries owe to their corporation a duty to exercise the utmost good faith and loyalty. Fiduciaries, as Justice Cardoza [sic] put it, must be held to something stricter than the morals of the marketplace.[38]

Professor Long explained the quote read by the Investors' trial counsel as an excerpt from the "classic opinion identifying a fiduciary duty." Next, the trial court, over Greenberg Traurig's objection, admitted into evidence a copy of Section 104.2 of the Texas Pattern Jury Charge on breach of fiduciary duty. From the Pattern Jury Charge, Professor Long testified in detail about each of the several duties owed by a fiduciary, including an attorney, to a principal or a client. Professor Long also testified at length about the "basic rules of conspiracy law" and "the nature of a conspiracy," explaining to the jury the actors

---

38. Trial counsel questioned Professor Long about *Holly v. International Mari–Culture Techs., Ltd.,* No. 131,114 (Chancery Ct., 1st Dist., Hinds County, Miss. Mar. 30, 1989) (quoting *Ellzey v. Fyr–Pruf, Inc.,* 376 So.2d 1328, 1332 (Miss.1979) (quoting *Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546 (1928))).

who are liable in a conspiracy. Finally, Professor Long spent a considerable amount of time explaining "Ponzi schemes."

The record also reveals a number of instances in which former Justice Wallace testified on questions of law. The vast majority of his testimony, based on his understanding and interpretation of the Texas Disciplinary Rules of Professional Conduct, was devoted to explaining to the jury an attorney's obligations with regard to disclosure and withdrawal from representation in various scenarios involving the discovery of a client's fraud. Former Justice Wallace also testified that the Texas rules of professional conduct are relevant to establishing the standard of care with regard to the negligence of attorneys. The former Texas Supreme Court Justice explained that the only opinion he read before giving testimony was the Texas Supreme Court's opinion in *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*.[39] He stated that his understanding was that this case was "the latest pronouncement from the Texas Supreme Court" with regard to Greenberg Traurig's duty of disclosure under the disciplinary rules. On cross-examination, former Justice Wallace stated, with regard to his prior testimony concerning multiple law firms working for the same client, "I'm merely trying to explain what I think the law is." Finally, former Justice Wallace opined on the difference between the role of the judge and the role of the jury.

Professor Long and former Justice Wallace also testified as to their understanding of the law. This they were prohibited from doing. *See Welder*, 794 S.W.2d at 433 (stating expert may not testify as to his understanding of law, but may only apply legal terms to his understanding of factual matters). It is not the role of the

expert witness to define the particular legal principles applicable to a case; that is the role of the trial court. *See Ledbetter v. Missouri Pac. R.R. Co.*, 12 S.W.3d 139, 144 (Tex.App.-Tyler 1999, pet. denied) (stating that the applicability of particular legal principles in a case is a matter of law for the trial court). As such, an expert may not usurp the trial court's role in trying the case. *See United States v. Cross*, 113 F.Supp.2d 1282, 1284 (S.D.Ind. 2000) (stating that "[e]ach courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards") (quotations omitted). The trial court erred in allowing Professor Long and former Justice Wallace to testify on questions of law.

### D. Reliability

Greenberg Traurig also contends Professor Long's and former Justice Wallace's testimony was unreliable because it not only ignored the controlling law, but also was contrary to well-established law. Unreliable evidence is of no assistance to the trier of fact and is therefore inadmissible under Texas Rule of Evidence 702. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex.1995). The reliability requirement focuses on the principles, research, and methodology underlying an expert's conclusions. *Zwahr*, 88 S.W.3d at 629. However, because it is impossible to set the criteria for evaluating the reliability of expert testimony in non-scientific cases such as this, it is within the trial court's discretion to determine how to assess reliability. *Weingarten Realty Invs. v. Harris County Appraisal Dist.*, 93 S.W.3d 280, 285 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Moreover, reliability is an issue of admissibility for the trial

---

**39.** 991 S.W.2d 787 (Tex.1999).

court, not a weight-of-the-evidence issue for the fact finder. *See General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex.1999).

■■ Professor Long testified that based on the law firm's fiduciary duty to IFT's board of directors, Greenberg Traurig owed a duty to disclose J. Summers' fraudulent activities to the board. The Investors essentially assert that any breach of Greenberg Traurig's duty to disclose fraud to IFT's board resulted in their damages. However, Texas law provides otherwise. "A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong." *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex.1990). The claim "must be brought by the corporation." *Id.; see also Abrams*, 498 N.Y.S.2d at 783, 489 N.E.2d at 751 (New York). Thus, Professor Long's opinion about Greenberg Traurig's purported fiduciary duties to the Investors was contrary to both Texas and New York law and unreliable.

Former Justice Wallace based his testimony on his interpretation of the Texas disciplinary rules, which govern the conduct of Texas attorneys. Lawyers not licensed to practice in Texas are not subject to Texas disciplinary rules: "A lawyer is subject to the disciplinary authority of this state [Texas], if admitted to practice in this state or if specially admitted by a court of this state for a particular proceeding." TEX. DISCIPLINARY R. PROF'L CONDUCT 8.05(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9); *see also* Tex. Comm. on Prof'l Ethics, Op. 516 (1996) ("We interpret the phrase 'admitted to practice in this state' to mean licensed

to practice law in Texas and admitted as a member of the State Bar of Texas. The jurisdiction of the State Bar of Texas does not permit it to take disciplinary action for any violation of the Texas Disciplinary Rules against any person who is not licensed to practice law in Texas or who is not specially admitted by a Texas court for a particular proceeding."). Greenberg Traurig's attorneys were not licensed to practice law in Texas, and they were not specially admitted by a Texas court for any particular proceeding relevant to this case. Therefore, Texas disciplinary rules are not applicable to their conduct. And, because former Justice Wallace's testimony was improperly based on Texas disciplinary rules, it was unreliable.

Former Justice Wallace further testified that the Texas disciplinary rules are "relevant to establish ... the standard of care, what's negligent or not." Thereafter, based on his professed knowledge of the rules of ethics, former Justice Wallace opined "a reasonably prudent lawyer" would be "foolish not to resign" after learning his client has not only committed a past fraud, but is continuing to commit fraud. He further testified that based on "reasonable care of lawyers" practicing in Texas, the "reasonable" lawyer should disclose to third parties that their services and reputation have been used to help perpetrate a fraud. We find this testimony improper. Even if Greenberg Traurig's attorneys had been licensed to practice in Texas and, thus, subject to the Texas disciplinary rules, those rules do not establish the standard of care or civil liability for attorneys.[40] Moreover, attorney negligence is not at issue in this case. Therefore, it was error for the trial court to permit former Justice Wallace to testify

---

**40.** *See* TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 15; *Joe*, 145 S.W.3d at 159, n. 2. Similarly, a violation of New York's code of professional responsibility does not provide for a private claim against an attorney. *Shapiro*, 677 N.Y.S.2d 48, 699 N.E.2d at 408.

that the standard of care for attorneys is based on the Texas disciplinary rules when no such liability can be based on any violation of those rules.

Finally, former Justice Wallace testified with regard to Greenberg Traurig's duty to disclose, stating that his:

> understanding is the latest pronouncement from the Texas Supreme Court is the *McCamish* case that we talked about earlier. If a lawyer knows that his services are being used to aid and abet in a wrongful illegal action, then the lawyer has a duty to make sure it stops immediately and not—then to advise the other side about it.

However, the question in the *McCamish* case concerned whether a law firm may be liable to a nonclient for negligent misrepresentation. *McCamish*, 991 S.W.2d at 788. Neither fraud nor the failure to disclose was at issue in that case. Therefore, any reference by former Justice Wallace to *McCamish* in that context is incorrect and, thus, unreliable.

### E. Assistance to the Jury

■ Greenberg Traurig also asserts the expert testimony of Professor Long and former Justice Wallace did not assist the jury. The fact that a witness has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier of fact. *Honeycutt*, 24 S.W.3d at 360. Expert testimony assists the trier of fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier of fact understand the evidence or determine a fact issue. *Id.* Evidence is irrelevant if it bears no relation to any issue in the case and, therefore, does not assist the jury as required by Texas Rule of Evidence 702. *Robinson*, 923 S.W.2d at 557. In other words, to be relevant, the proffered testimony must be "sufficiently tied to the facts of the case [and] that it will aid the jury in resolving a factual dispute." *Id.* (quotations omitted).

■ Expert testimony is admissible to aid the jury in its decision, but it may not supplant the jury's decision. *Perkins v. State*, 902 S.W.2d 88, 93 (Tex.App.-El Paso 1995, pet. ref'd). "The question under Rule 702 is not whether the jurors know something about this area of expertise but whether the expert can expand their understanding of this area in any way that is relevant to the disputed issues in the trial." *Glasscock v. Income Prop. Servs., Inc.*, 888 S.W.2d 176, 180 (Tex.App.-Houston [1st Dist.] 1994, writ dism'd by agr.) (quotations omitted).

■ Greenberg Traurig complains of Professor Long's testimony on the fiduciary duties owed to IFT's board by Greenberg Traurig and the law firm's purported breach of those duties. As discussed above, the corporation is the only party that can bring a claim against Greenberg Traurig for any breach of those fiduciary duties. *See Abrams v. Donati*, 66 N.Y.2d 951, 498 N.Y.S.2d 782, 783, 489 N.E.2d 751 (1985) (stating that under New York law, shareholder has no individual claim for wrong to corporation); *Wingate*, 795 S.W.2d at 719 (same under Texas law). This is true even if the Investors sustained damages as a result of a breach. *See Abrams*, 498 N.Y.S.2d at 783, 489 N.E.2d at 751; *Wingate*, 795 S.W.2d at 719. Professor Long's testimony with regard to duties Greenberg Traurig purportedly owed to IFT's board of directors was not relevant to any issue in the case and, thus, could not have provided any assistance to the jury.

■ We similarly conclude that former Justice Wallace's testimony was not relevant and, therefore, did not assist the jury

in any way that is germane to the matters in dispute. Because the Investors have no claim, and indeed could maintain no claim, against Greenberg Traurig for negligence, and because Greenberg Traurig attorneys were not subject to the Texas disciplinary rules, former Justice Wallace's opinions should not have been admitted into evidence.

## F. Harm Analysis

■ To reverse a judgment based on error in the admission or exclusion of evidence, we must conclude that the error probably caused the rendition of an improper judgment. TEX.R.APP. P. 44.1; *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex.1989). Error regarding evidentiary rulings is usually not reversible unless the judgment turns on the particular excluded or admitted evidence. *Port Terminal R.R. Ass'n v. Richardson*, 808 S.W.2d 501, 510 (Tex.App.-Houston [14th Dist.] 1991, writ denied).

■ Most of former Justice Wallace's testimony concerned his interpretation of the Texas disciplinary rules with regard to an attorney's duty to withdraw from representation of a client and disclose certain material facts to third parties. There are many problems with this testimony.

First, the Texas rules of professional conduct specifically reject the notion that attorneys not licensed in Texas are subject to these disciplinary rules. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 8.05(a) & cmt. 1. Thus, although Texas disciplinary rules were not even applicable to the Greenberg Traurig attorneys' conduct, the jury was allowed to consider Greenberg Traurig's alleged deficiencies under the Texas rules.

Second, former Justice Wallace opined at length that the disciplinary rules set forth the standard for civil liability for attorney misconduct and that Greenberg Traurig was negligent for failing to withdraw from its legal representation of IFT and for failing to disclose J. Summers' fraudulent activities. Thus, the jury was allowed to draw the conclusion that the Investors could recover for any violation by Greenberg Traurig of the disciplinary rules, yet a violation of the disciplinary rules does not in itself give rise to civil liability against an attorney.[41] Moreover, attorney malpractice was not alleged against Greenberg Traurig, and no such claim could have been maintained against the law firm because third parties cannot maintain a negligence claim against attorneys with whom they did not have privity. *See McCamish, Martin, Brown & Loeffler*, 991 S.W.2d at 792. Nonetheless, the jury was allowed to hear evidence of Greenberg Traurig's purported negligence, which was not an issue in this case. Likewise, the jury was allowed to infer that Greenberg Traurig was negligent in not withdrawing its representation of IFT and in not disclosing certain facts, even though the Investors could not have maintained a negligence claim against Greenberg Traurig.

Third, former Justice Wallace incorrectly based his opinions concerning Greenberg Traurig's purported duty of disclosure on the *McCamish* case. Not only were these opinions based on a case that did not address fraud or disclosures, but former Justice Wallace, himself once a member of the Texas Supreme Court, was allowed to present his opinions as being derived from that case, thereby lending the authority and weight of our state's highest civil court to his opinions.

Fourth, former Justice Wallace's explanation of the role of the trial judge versus the role of the jury was not relevant to any issue in this case. Any instruction on the

---

**41.** *See* TEX. DISCIPLINARY R. PROF'L CONDUCT preamble ¶ 15; *Joe,* 145 S.W.3d at 159.

respective roles of the judge and jury is to be given by the trial judge. Former Justice Wallace's explanation to the jury likely gave the appearance that he had more authority than the trial judge, who was supposed to be the administrator of the court and the one trying the case.

Professor Long's testimony on Greenberg Traurig's purported breach of fiduciary duties for failure to disclose J. Summers' fraud was prejudicial because the jury was allowed to conclude that the Investors could recover damages resulting from the law firm's failure to make such disclosures to the board—a conclusion that is completely contrary to the law. *See Abrams,* 498 N.Y.S.2d at 783, 489 N.E.2d at 751 (New York); *Wingate,* 795 S.W.2d at 717 (Texas). Professor Long's testimony on questions of law was also problematic because it likely gave the appearance that, as a law school professor, he may have had more experience and knowledge than the trial judge. The prejudicial impact of this testimony on the jury, in some cases, can result in the rendition of an improper judgment. As the Texas Supreme Court has explained:

> Expert witnesses can have an extremely prejudicial impact on the jury, in part because of the way the jury perceives a witness labeled as an expert. "[T]o the jury an 'expert' is just an unbridled authority figure, and as such he or she is more believable." A witness who has been admitted by the trial court as an expert often appears inherently more credible to the jury than does a lay witness. Consequently, a jury more readily accepts the opinion of an expert witness as true simply because of his or her designations as an expert.

*Robinson,* 923 S.W.2d at 553 (citations omitted).

The potential prejudicial effect of an attorney testifying as an expert is of greater significance than that of other experts. *See Specht v. Jensen,* 853 F.2d 805, 808 (10th Cir.1988) (observing significant difference exists "between an attorney who states his belief of what law should govern the case and any other expert witness."). Though merely being a lawyer does not disqualify one as an expert witness,[42] it is an important consideration and the trial court must be mindful of the impact of allowing attorneys to testify about the law. By permitting attorneys to state opinions as to what the applicable law is, the trial judge voluntarily allows his role as the legal expert in the courtroom to be usurped or diminished by the testifying attorney. Thus, when attorneys are qualified as experts on certain areas of the law, the jury will be tempted to turn to the expert, rather than the trial judge, for guidance on the law. *See Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 366 (4th Cir.1986). These concerns are magnified when the expert witnesses are not merely practicing attorneys in a given area of the law, but are cloaked with the authority associated with being a learned legal scholar, a law school professor, or a former supreme court justice. *See United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc.,* 949 S.W.2d 707, 713 (Tex.App.-San Antonio 1997, writ denied) (stating that "[i]n light of Dean Aldave's credentials and the weight likely given her testimony by the jury, we conclude that the admission of her testimony was calculated to cause and probably did cause the rendition of an improper judgment.").

Finally, except for attorney's fees experts, Professor Long and former Justice Wallace were the Investors' only expert witnesses and their testimony comprised more than half of the Investors' entire

**42.** *Askanase v. Fatjo,* 130 F.3d 657, 672 (5th Cir.1997).

case. The record shows there were a total of sixteen days of testimony. Professor Long, the Investors' first witness, testified for the first eight days—one-half of the trial. This testimony was followed by the testimony of former Justice Wallace. The Investors' other witnesses testified solely as to factual matters.

Viewing the combined impact of these factors, we conclude the trial court erred in allowing Professor Long and former Justice Wallace to testify on pure questions of law, to base their opinions on incorrect statements of the law, and to opine on issues not relevant to the case. We conclude the trial court's error probably caused the rendition of an improper judgment.

## IX. Cross Appeal

### A. Bruce Payette

In their first issue, the Investors, as cross-appellants, claim the trial court erred in not disregarding a negative answer that the jury gave in the conspiracy question concerning Bruce Payette and Greenberg Traurig. The jury found that Greenberg Traurig was not liable to Bruce Payette on his claims for common-law fraud, statutory fraud, and violations of the Texas Securities Act. The jury, however, found other defendants—J. Summers, IFT, Philip Templeman, and Elaine Templeman—liable to Bruce Payette on his fraud-based claims. In the conspiracy question, the jury was asked whether any of the defendants were part of a single conspiracy that damaged one or more of the Investors. The jury answered that Greenberg Traurig was part of a conspiracy with J. Summers, IFT, Philip Templeman, and Elaine Templeman; however, the conspiracy question contained a grid with the Investors along one axis, the defendants along the other axis, and squares in which the jury could answer "yes" or

"no." The jury answered "no" in the square joining Bruce Payette with Greenberg Traurig. Based on this negative answer from the jury and the jury's failure to find in Bruce Payette's favor on his other claims against Greenberg Traurig, the trial court awarded Bruce Payette no damages against Greenberg Traurig in its judgment, although it awarded Bruce Payette damages against J. Summers, IFT, Philip Templeman, and Elaine Templeman.

Even though Greenberg Traurig was not retained until after Bruce Payette had purchased his shares in IFT, the Investors contend Greenberg Traurig is liable as a conspirator for Payette's damages, as a matter of law, because a conspirator becomes jointly and severally liable for all injuries previously sustained by the claimant at the time the new conspirator joined the then-existing conspiracy. Based on this argument, the jury's findings that Greenberg Traurig was part of a conspiracy, and the jury's findings that Greenberg Traurig's co-conspirators defrauded Bruce Payette, the Investors requested that the trial court disregard the jury's negative answer in the box connecting Bruce Payette and Greenberg Traurig and enter judgment in favor of Bruce Payette and against Greenberg Traurig despite this negative answer. The trial court denied this request.

Bruce Payette's brother, Dennis Payette, was a member of IFT's board of directors and Special Assistant to the Chairman. Dennis Payette's role at IFT was to locate investor groups that would be willing to bring IFT into their community. Bruce Payette became aware of IFT when Dennis Payette joined the company. In 1995, Dennis Payette asked Bruce Payette to arrange for a group of community leaders to attend a presentation in Nacogdoches, Texas, on IFT and aquaculture. Dennis Payette and J. Summers made the

presentation. Bruce Payette decided to buy shares in IFT after he saw the 1995 presentation. Bruce Payette was issued 1,500 shares in IFT on September 27, 1995, 400 shares on February 7, 1996, and 1,000 shares on February 7, 1996. IFT did not retain Greenberg Traurig until November 1996, several months after Bruce Payette had made his last investment in IFT.

It is well-settled law that upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy. *State v. Standard Oil Company*, 130 Tex. 313, 107 S.W.2d 550, 560 (1937); *Bourland v. State*, 528 S.W.2d 350, 354 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.). Therefore, if Greenberg Traurig were part of the conspiracy, its late entry into it would not relieve Greenberg Traurig of liability, if any, for Bruce Payette's damages caused by Greenberg Traurig's co-conspirators. *See Standard Oil Co.*, 107 S.W.2d at 560 (stating that a coconspirator, "having once entered the conspiracy, however late, becomes in law a party to every act previously or subsequently done by any of the others in pursuance of it"); *Bourland*, 528 S.W.2d at 354 (same).[43]

▉ Based on this law, the jury's findings that others alleged to be co-conspirators defrauded Bruce Payette, and the jury's findings that Greenberg Traurig was part of a conspiracy with Summers, IFT, Philip Templeman, and Elaine Templeman, we conclude the trial court erred in not disregarding the jury's negative answer. We sustain the Investors' first cross-issue and reverse the judgment on Bruce Payette's conspiracy claim. However, in light of our determination that the trial court's error in admitting the expert testimony of Professor Long and former Justice Wallace was harmful and compels a new trial of the conspiracy claims, we must also remand for a new trial Bruce Payette's claim regarding Greenberg Traurig's alleged conspiracy to commit common-law fraud.

**B. Common–Law Fraud Damages**

In their second issue, the Investors, as cross-appellants, argue the trial court erroneously denied damages found by the jury for common-law fraud by limiting those actual damages against Greenberg Traurig to only the amount of money they paid for the IFT stock.[44] The trial court, however, reduced the dollar amount to the same amount the jury found on all other theories of recovery, i.e., the amount of money the Investors paid for their stock.[45] Because of our disposition of the Investors' claims for fraud, it is not necessary for us to consider this cross-issue.

**X. CONCLUSION**

In summary, we hold that the trial court erred in applying Texas law instead of

---

**43.** Greenberg Traurig argues the possibility of multiple conspiracies; however, the jury charge refers to only a single conspiracy.

**44.** The jury found the following damages for common-law fraud against the defendants:

| | |
|---|---|
| Moody | $ 20,702,700 |
| Briscoe | $ 900,000 |
| Williams | $ 825,000 |
| Payette | $ 435,000 |

**45.** The trial court's judgment awarded the following actual damages against Greenberg Traurig:

| | |
|---|---|
| Moody | $ 690,090 |
| Briscoe | $ 30,000 |
| Williams | $ 27,500 |
| Payette | $ 0 |

However, the trial court's judgment awarded the following actual damages against J. Summers, IFT, Philip Templeman, and Elaine Templeman.

| | |
|---|---|
| Moody | $ 20,012,610 |
| Briscoe | $ 870,000 |
| Williams | $ 822,500 |
| Payette | $ 425,000 |

New York law to the Investors' fraud-based claims. Because New York law does not provide for a private claim for statutory securities fraud, we reverse that portion of the judgment and render judgment that the Investors take nothing by their statutory securities fraud claims. Similarly, because it was error to apply Texas law to the fraud-based claims, the Investors cannot recover under Section 27.01 of the Texas Business and Commerce Code; therefore, we reverse that portion of the judgment and render judgment that the Investors take nothing on their statutory fraud claims. We further hold that the Investors cannot recover on their claims for common-law fraud for non-disclosure based on the violation of an ethical duty or in the absence of a fiduciary relationship; accordingly, we reverse that portion of the judgment and render judgment that the Investors take nothing on their claims for common-law fraud.

We also hold that the trial court erred in admitting the expert testimony of Professor Long and former Texas Supreme Court Justice Wallace and that this error was harmful. In light of this holding and our finding that the evidence is legally sufficient to support the jury's finding of conspiracy to commit common-law fraud, we reverse that portion of the judgment and remand to the trial court for a new trial as to the claims of Moody, Briscoe, and Williams for conspiracy to commit common-law fraud.

Finally, with respect to the Investors' cross-appeal, we hold that Greenberg Traurig can be liable as a co-conspirator for Bruce Payette's damages, if any, even if the law firm did not join the conspiracy until after Bruce Payette made his investment. Therefore, we reverse that portion of the judgment denying Bruce Payette's recovery from Greenberg Traurig on his claim for conspiracy to commit common-law fraud and remand that claim to the trial court for a new trial.

Accordingly, we reverse and render, in part, and reverse and remand, in part, for a new trial.